20-2194-cv
*Radwan v. Manuel*

# United States Court of Appeals
## for the Second Circuit

_____

August Term 2020

(Argued:  June 25, 2021      Decided:  November 30, 2022)

No. 20-2194

_____

NORIANA RADWAN,

*Plaintiff-Appellant,*

— v. —

WARDE MANUEL, LEONARD TSANTIRIS, and MONA LUCAS, in their individual
capacities, and the UNIVERSITY OF CONNECTICUT BOARD OF TRUSTEES,

*Defendants-Appellees.*∗

_____

Before:      CARNEY, BIANCO, *Circuit Judges*, and KOMITEE, *District Judge*.∗∗

In 2014, Noriana Radwan, then a women's soccer player at the University of
Connecticut ("UConn") and recipient of a one-year athletic scholarship, raised her
middle finger to a television camera during her team's post-game celebration after
winning a tournament championship.  The game was being nationally televised

_____

∗ The Clerk of the Court is respectfully instructed to amend the caption to conform with
the above.

∗∗  Judge Eric R. Komitee, of the United States District Court for the Eastern District of
New York, sitting by designation.

and Radwan's gesture was captured on the broadcast. Although she initially was suspended from further tournament games for that gesture, Radwan was ultimately also punished by UConn with a mid-year termination of her athletic scholarship. She brought this lawsuit against UConn (through its Board of Trustees) and several university officials alleging, *inter alia*, violations of her First Amendment and procedural due process rights under 42 U.S.C. § 1983, as well as a violation of Title IX of the Education Amendments Act of 1972 ("Title IX"), 20 U.S.C. § 1681, in connection with the termination of her scholarship. On appeal, Radwan challenges the decision of the district court (Bolden, J.) granting the defendants' motion for summary judgment on those claims.

We agree with the district court's decision to grant summary judgment as to Radwan's First Amendment and due process claims. With respect to the free speech claim, we do not address the district court's determination that there were triable issues of fact as to whether UConn's discipline of Radwan violated her First Amendment rights, but rather affirm the district court's ultimate holding that summary judgment must be granted in favor of the individual defendants on qualified immunity grounds. Second, although we conclude that Radwan possessed a constitutionally protected property interest in her one-year athletic scholarship, which could only be terminated for cause under its terms, we affirm the grant of summary judgment on this due process claim on the ground that the individual defendants are entitled to qualified immunity because such a right was not clearly established at the time of the scholarship's termination.

However, we disagree with the district court's conclusion that Radwan's Title IX claim does not survive summary judgment. Radwan has put forth sufficient evidence, including a detailed comparison of her punishment to those issued by UConn for male student-athletes found to have engaged in misconduct, to raise a triable issue of fact as to whether she was subjected to a more serious disciplinary sanction, *i.e.*, termination of her athletic scholarship, because of her gender.

Accordingly, we **AFFIRM** the district court's grant of summary judgment as to Radwan's procedural due process and First Amendment claims and **VACATE** the district court's judgment to the extent it granted summary judgment to UConn on the Title IX claim. The case is **REMANDED** to the district court for further proceedings consistent with this opinion.

ANDREW T. TUTT (R. Stanton Jones, Kolya D. Glick, Graham W. White, Shira V. Anderson, *on the brief*), Arnold & Porter Kaye Scholer LLP, Washington, DC; Gregory J. Tarone, Sports Lawyers International PLLC, Mount Kisco, NY (*on the brief*); Jonathan J. Klein, Parlatore Law Group, LLP, Bridgeport, CT (*on the brief*), *for Plaintiff-Appellant*.

ROSEMARY M. MCGOVERN, Assistant Attorney General, *for* William Tong, Attorney General; Michael Skold, Deputy Solicitor General, Hartford, CT, *for Defendants-Appellees*.

JOSEPH F. BIANCO, *Circuit Judge*:

In 2014, Noriana Radwan, then a women's soccer player at the University of Connecticut ("UConn") and recipient of a one-year athletic scholarship, raised her middle finger to a television camera during her team's post-game celebration after winning a tournament championship. The game was being nationally televised and Radwan's gesture was captured on the broadcast. Although she initially was suspended from further tournament games, Radwan was ultimately also punished by UConn with a mid-year termination of her athletic scholarship. She brought this lawsuit against UConn (through its Board of Trustees) and several

3

university officials alleging, *inter alia*, a violation of her First Amendment and procedural due process rights under 42 U.S.C. § 1983, as well as a violation of Title IX of the Education Amendments Act of 1972 ("Title IX"), 20 U.S.C. § 1681, in connection with the termination of her scholarship. On appeal, Radwan challenges the decision of the district court (Bolden, J.) granting the defendants' motion for summary judgment on those claims.

We agree with the district court's decision to grant summary judgment as to Radwan's First Amendment and due process claims. With respect to the free speech claim, we do not address the district court's determination that there were triable issues of fact as to whether UConn's discipline of Radwan violated her First Amendment rights, but rather affirm the district court's ultimate holding that summary judgment must be granted in favor of the individual defendants on qualified immunity grounds. Second, although we conclude that Radwan possessed a constitutionally protected property interest in her one-year athletic scholarship, which could be terminated only for cause under its terms, we affirm the grant of summary judgment on the ground that the individual defendants are entitled to qualified immunity because such a right was not clearly established at the time of the scholarship's termination.

However, we disagree with the district court's conclusion that Radwan's Title IX claim does not survive summary judgment. Radwan has put forth sufficient evidence, including a detailed comparison of her punishment to those issued by UConn for male student-athletes found to have engaged in misconduct, to raise a triable issue of fact as to whether she was subjected to a more serious disciplinary sanction, *i.e.*, termination of her athletic scholarship, because of her gender.

Accordingly, we **AFFIRM** the district court's grant of summary judgment as to Radwan's procedural due process and First Amendment claims and **VACATE** the district court's judgment to the extent it granted summary judgment to UConn on the Title IX claim. The case is **REMANDED** to the district court for further proceedings consistent with this opinion.

## I. BACKGROUND

### A. Factual Background[1]

In early 2014, Radwan was a high school senior in New York and a skilled soccer player. After receiving offers for athletic scholarships from multiple colleges in Division I of the National Collegiate Athletic Association ("NCAA"),

---

[1] The facts set forth below are drawn from the record on summary judgment before the district court. Any relevant factual disputes are noted.

Radwan chose to attend UConn and accepted its offer of an athletic scholarship to play on its women's soccer team. As an NCAA Division I school and member of the American Athletic Conference ("AAC"), UConn is subject to the bylaws, rules, policies, and code of sportsmanship of both entities.

     1.  The Terms and Conditions of Radwan's Scholarship

In 2014, while a high school senior, Radwan signed both a National Letter of Intent with UConn, stating her intent to enroll at UConn, and a financial aid agreement with UConn, providing that she would receive a one-year, full-tuition, athletic scholarship for her participation on the women's soccer team.[2] Her athletic scholarship covered the cost of tuition, fees, room, board, and course-related books. As a condition of that scholarship, Radwan was subject to obligations and responsibilities contained in her scholarship agreement with UConn, the UConn 2013–2014 Student-Athlete Handbook, and the 2013–2014 NCAA Division I Manual.

---

[2] Although the parties use "grant-in-aid," "financial aid," and athletic "scholarship" interchangeably, this opinion uses the term "scholarship" to describe the financial assistance Radwan received for playing on the UConn women's soccer team. Moreover, because the parties interchangeably use the terms "cancellation" and "termination" as it relates to Radwan's athletic scholarship, this opinion does the same.

6

Under the scholarship agreement, Radwan's scholarship could "be immediately reduced or canceled during the term of [the] award if" she "engage[d] in *serious misconduct* that brings substantial disciplinary penalty." Joint App'x at 59 (emphasis added). However, the scholarship could "not be increased, reduced or canceled during the period of its award on the basis of [her] athletics ability, performance or contribution to the team's success . . . or for any other athletics reason." *Id.* at 58.

The UConn Student-Athlete Handbook (the "Handbook") prohibited unsportsmanlike behavior including, but not limited to, "[u]sing obscene or inappropriate language or gestures to officials, opponents, team members or spectators"; "[t]hrowing of objects at . . . spectators"; and "[v]iolating generally recognized intercollegiate athletic standards or the value and standards associated with the University as determined by [the] Head Coach and approved by the Athletic Director." *Id.* at 73. The Handbook also noted that student-athletes "become [] representative[s] of [their] team and of [their] University." *Id.* at 73. At the beginning of the 2014–2015 school year, Radwan verified that she had an obligation to "read and understand" the Handbook and agreed that a violation of

7

the UConn Student Code (which governed conduct for UConn students generally) could render her scholarship null and void. *Id.* at 295.

Under Bylaw 15.3.4.2(c) of the NCAA Division I Manual, "[i]nstitutional financial aid based in any degree on athletics ability may be reduced or canceled during the period of the award if the recipient: . . . (c) Engages in *serious misconduct* warranting substantial disciplinary penalty." *Id.* at 641 (emphasis added). The NCAA bylaws at no point define "serious misconduct."

The head coach of the women's soccer team, defendant Leonard Tsantiris (hereinafter, "Coach Tsantiris"), also developed a team "contract" for the 2014 season to establish additional rules applicable to the team, which all team members received and to which they all agreed. The contract required, *inter alia*, that team members "comply with all University, Athletic Department and Women's soccer program rules concerning conduct and behavior." *Id.* at 594.

2.  The November 9, 2014 Incident

In August 2014, Radwan began as a student at UConn and a member of the women's soccer team. During the 2014–15 school year, defendant Warde Manuel served as Athletic Director for UConn (hereinafter, "AD Manuel") and Coach Tsantiris served as the head coach for the women's soccer team. The assistant

8

coaches for the women's soccer team were Margaret Rodriguez and Zachary Shaw (hereinafter "Assistant Coach Rodriguez" and "Assistant Coach Shaw"). Coach Tsantiris reported ultimately to AD Manuel, but did so through UConn's Senior Associate Director of Athletics, Neal Eskin (hereinafter "SA Eskin"), who handled day-to-day matters. During this school year, defendant Mona Lucas served as the UConn Director of Student Financial Aid Services (hereinafter, "FAD Lucas").

On November 9, 2014, the UConn women's soccer team won the AAC tournament championship game against the University of South Florida ("USF"), which was played at USF. The game was broadcast live on ESPNU. Radwan displayed her middle finger to the television camera during the team's on-field post-game victory celebration, and the gesture was broadcast nationally. The gesture lasted for a brief moment before Radwan changed it to a peace sign. The ESPNU cameraman, who had filmed Radwan's gesture, could not say that the gesture was directed at the opposing team, and further testified that he did not see any players from the opposing team while he was filming. Nevertheless, the parties agree that the gesture "created an immediate social media and internet topic." *Id.* at 595.

SA Eskin, who was with the women's soccer team at the game, received a screenshot of Radwan's gesture and showed it immediately to Coach Tsantiris. AD Manuel, although not at the game, was shown a screen shot of Radwan's gesture shortly after the incident. He directed the UConn Athletic Department staff to immediately contact the women's soccer coaches about the incident to ensure the behavior was not repeated. AD Manuel testified that he felt Radwan's behavior was publicly embarrassing to Radwan, the team, and UConn because it was unsportsmanlike and disrespectful.

Shortly after the game, and while still at the venue, Coach Tsantiris confronted Radwan about the gesture and informed her that she was suspended from all team activities, including the upcoming NCAA tournament. According to Radwan, Coach Tsantiris told her he knew she did not mean the gesture, and that it was a "silly mistake." *Id.* at 17. After midnight that night, Radwan emailed Assistant Coach Rodriguez to apologize, saying that she was "truly sorry" for the gesture, while recognizing that her apology "in no way" excused it. *Id.* at 65. She then stopped by the coaches' office the following day to speak to the coaching staff in person.

On the day after the game, the UConn Athletic Department issued a press release from Coach Tsantiris—with help from SA Eskin and other UConn Athletic Department Staff—confirming that Radwan had been "suspended indefinitely from team activities and w[ould] not play in the NCAA tournament." *Id.* at 63. AD Manuel never received a complaint from the USF coach or USF players or from any other part of that university.

Also on November 10, 2014, Ellen Ferris, Associate Commissioner for Governance and Compliance for the AAC, spoke with Deborah Corum, Senior Associate Director of Athletics at UConn (hereinafter "SA Corum"), about Radwan's gesture at the game. In a subsequent email to SA Corum, Ferris wrote that the AAC had a video of Radwan's gesture at the game, and the AAC believed the gesture was a potential violation of its Code of Conduct. Commissioner Ferris requested from UConn any further information it had about the incident, as well as about any corrective measures that had been or would be taken by UConn. SA Corum forwarded this request to SA Eskin, who responded with a narrative of the incident. Susan Herbst, the President of UConn, asked AD Manuel in an email, dated November 10, 2014, about the penalty being imposed by the AAC, and Manuel responded: "Letter of reprimand. I would believe that would be all they

11

would do.  Anything else would be excessive.  She's already been suspended by [Coach Tsantiris]."  *Id.* at 637.

On November 11, 2014, the AAC issued a Commissioner's Report to UConn, which found that, "[a]lthough [Ms. Radwan] indicated to the coach that she 'was caught in the heat of the moment,'" her gesture to the ESPNU camera was "a clear violation of the Conference Code of Conduct."  *Id.* at 256.  The AAC also commended UConn's actions to address Radwan's behavior.  Further, attached to the Commissioner's Report was a letter of reprimand from the ACC to Radwan. The Commissioner's Report describes the issuance of a reprimand letter as "typical in cases where an individual makes an obscene gesture."[3]  *Id.* at 256 (ACC Commissioner's Report).

Upon receiving the Commissioner's Report, AD Manuel and SA Corum met with Radwan and informed her that she had been sent a letter of reprimand from the AAC.  In accepting the letter of reprimand, SA Corum wrote an email, dated November 11, 2014, to Commissioner Ferris stating, in relevant part:

> [AC Manuel] and I met with [Radwan] an hour ago and as part of the conversation, he informed her that she had received a letter of reprimand from the Commissioner for violating the Conference Code of Conduct.  He also notified her that should she breach this policy in

[3]  According to UConn, Radwan was the only student-athlete at UConn reprimanded by the AAC from 2013 to October 2019.

the future, that this reprimand could be used to indicate that she receive more substantial penalties. [AD Manuel] shared a quote with her that sums up the lesson for her: "The proactive approach to a mistake is to acknowledge it instantly, correct and learn from It." (Stephen Covey). We believe that [Radwan] has learned from this experience as she is being proactive in acknowledging her mistake and is trying to correct the harm that was done. She is remorseful and took it upon herself to approach [AD Manuel] to express her apologies. She has learned a valuable the [sic] lesson the hard way but we hope that now we can all put this behind us and move on to winning a national championship in women's soccer.

*Id.* at 637–38.

On that same day, AD Manuel sent an email to President Herbst regarding the AAC, stating: "Case closed with the reprimand." *Id.* at 638. Until that time, no report about the November 9, 2014 incident had been made to the UConn Office of Community Standards, which addresses alleged violations of the Student Code by UConn students and has specific procedures (including disciplinary hearings) for handling such matters. The UConn women's soccer team played NCAA tournament games on November 15 and November 22, 2014, and Radwan did not participate due to her suspension from the team by UConn.

After sitting out the NCAA tournament, Radwan had several communications with UConn AD personnel about her future on the team. At some point before the Thanksgiving break, Assistant Coach Shaw met with

13

Radwan regarding the incident. He told Radwan that her misconduct was "serious" and that it could impact her scholarship. *Id.* at 601. Also in early December 2014, Radwan met with Coach Tsantiris for an individual meeting that he held with every member of the women's soccer team at the end of the season, during which he told her that she needed to work on her fitness and schoolwork for the upcoming year. He also told her that he would make a decision at the end of the semester about her future on the team, and Radwan again apologized. Coach Tsantiris did not tell Radwan at this meeting that he was considering recommending to his superiors that her scholarship be cancelled and that she be taken off the team.[4] According to Coach Tsantiris, he withheld this information because he was concerned it could be devastating to her, and he did not want to distract her from her final exams.

Assistant Coach Rodriguez and Radwan also met after Radwan's end-of-season meeting with Coach Tsantiris. She told Radwan that she did not know about her future on the team, but that Coach Tsantiris was very upset about her

---

[4] At the end of November 2014, Coach Tsantiris was recruiting high school players and was teased by other coaches about Radwan's behavior. According to Coach Tsantiris, by December, he had concluded that Radwan had "embarrass[ed] the program, the school, [and] the athletic department" and his "feeling was that we probably won't keep [Radwan] most likely." *Id.* at 419.

14

behavior because other coaches, alumni, and fans were teasing him about the incident and talked to him more about it than the team's AAC victory.

### 3. The Termination of Radwan's Scholarship

At UConn, the process for cancelling or terminating a student-athlete's athletic scholarship for disciplinary reasons begins with the student-athlete's coach making a recommendation to the Sport Administrator. The Sport Administrator, in turn, delivers a recommendation to the Athletic Director, who makes the final decision. The same procedure applies to the decision to remove a student-athlete from a team. The Student-Athlete Handbook sets forth no specific procedure governing the termination of an athletic scholarship in the middle of the year.

In December 2014, at the end of the semester, Coach Tsantiris recommended to SA Eskin and AD Manuel that Radwan's scholarship should be terminated for "serious misconduct"—namely, showing her middle finger to the ESPNU camera. AD Manuel, Coach Tsantiris, and SA Eskin met to discuss the termination of Radwan's athletic scholarship, and AD Manuel made the final decision to cancel her one-year athletic scholarship for the 2015 spring semester. Assistant Coaches Rodriguez and Shaw agreed with the decision.

15

On December 21, 2014, Coach Tsantiris called Radwan to tell her that she was being removed from the team and her scholarship had been terminated for the spring semester. Radwan asserts that, during either the December 21 phone call or on a call soon thereafter, Coach Tsantiris said he would assist with her transfer to another school only if she did not appeal his decision. After that telephone call, Radwan sent an email to Coach Tsantiris, and copied AD Manuel and Assistant Coach Rodriguez, requesting that he reconsider his decision to remove her from the team and end her athletic scholarship. Radwan also sent a letter to AD Manuel about the decision to take away her scholarship and asked for his help.

On December 22, 2014, Assistant Coach Rodriguez responded to Radwan's email, copying Coach Tsantiris and Assistant Coach Shaw, and advised Radwan that the "decision [wa]s final" and that the Athletic Department and coaching staff were "moving forward with cancelling [he]r aid for the spring semester based on misconduct." *Id.* at 327. The email also advised that, although her athletic scholarship was being cancelled, Radwan could remain as a student at UConn in the spring. In addition, Assistant Coach Rodriguez offered in the email "to do what we can to help [Radwan] find a program" if she sought to transfer. *Id.* at 327.

16

The Office of Student Financial Aid Services then signed a letter formally cancelling Radwan's athletic scholarship for the 2015 spring semester and provided it to Athletics Compliance to send to Radwan. The letter, dated December 22, 2014, stated that Radwan's scholarship had been cancelled because of "a serious misconduct issue" and that, if she considered the cancellation of the aid to be unfair or unjustified, she could request a hearing by contacting the Financial Aid Office "within fourteen business days of *receipt* of th[e] letter." *Id.* at 297 (emphasis added). The letter also attached the UConn Financial Aid Hearing Procedure, Bylaw 15.3.2.3, which listed a slightly different time period to request an appeal, namely, that a request had to be filed by fourteen business days *from the date on* the letter. Radwan received the letter on December 24, 2014.[5]

On January 5, 2015, Suzanne Pare, Assistant to the Director of Student Financial Aid Services at UConn, emailed Radwan on behalf of FAD Lucas. She wrote "to find out if [Radwan was] going to request an appeal hearing regarding [her] financial aid" and asked that Radwan forward any request she might have sent to FAD Lucas the previous week, since FAD Lucas had been away from the office. *Id.* at 515–16.

---

[5]  Fourteen business days from December 22, 2014 was January 13, 2015. Fourteen business days from December 24, 2014 was January 15, 2015.

17

On January 14, 2015, Radwan sent a letter to Lucas "formally requesting a hearing" on the decision to cancel her athletic scholarship. *Id.* at 137. On January 23, 2015, FAD Lucas became aware of Radwan's request for a hearing to appeal the cancellation. FAD Lucas forwarded an email with Radwan's appeal request to other financial aid staff, asking: "Did you share a copy of appeal request with me and Suzanne [Pare] during the holiday season? It looks like we are now out of compliance with the appeal process. What happened here?" *Id.* at 518. Financial Aid staff, including FAD Lucas, consulted with UConn's Athletics Compliance staff about whether a hearing would be required. The Athletics Compliance staff advised the Financial Aid staff that, in their view, the opportunity to request a hearing lapsed prior to Radwan's sending the appeal letter.

On January 29, 2015, Lucas notified Radwan that her appeal "request ha[d] been denied because the request for a hearing was not submitted within 14 business days of the December 22, 2014 notification letter." *Id.* at 517. Radwan and Financial Aid Services exchanged subsequent email communications in early February 2015 regarding her desire to appeal, and her belief that her appeal was timely because she had requested a hearing on January 14, 2015, which was within 14 days of her receipt of the notification letter.

18

## 4. Radwan's Transfer to Another University

On December 22, 2014, after UConn cancelled Radwan's scholarship, Athletics Compliance provided her with a letter via email, permitting her to contact other institutions about the possibility of transferring and playing soccer with another institution. While continuing to communicate with UConn in December 2014 and January 2015 regarding her desire to appeal the cancellation of her athletic scholarship, Radwan also pursued a transfer to a new school where she could join the soccer program in the spring of 2015, and Assistant Coach Rodriguez assisted Radwan in those efforts.

In early January 2015, the head women's soccer coach at Hofstra University ("Hofstra") offered Radwan the opportunity to transfer there and join the women's soccer team with a partial academic scholarship. Radwan accepted the coach's offer. On January 13, 2015, Radwan submitted a request to UConn to be released from her obligations under her National Letter of Intent. After that request was granted, she cancelled her enrollment at UConn for the spring of 2015. On January 21, 2015, Radwan received a written athletic scholarship offer from Hofstra, which she then signed, and began classes at Hofstra in late January 2015. Radwan graduated from Hofstra in 2018.

### B. Procedural History

On December 19, 2016, Radwan filed her *pro se* complaint in the district court asserting claims against UConn, through its Board of Trustees, as well as Coach Tsantiris, AD Manuel, and FAD Lucas (hereinafter, the "Individual Defendants") in their individual and official capacities.[6] The complaint asserted a Title IX claim for gender discrimination against UConn, and Section 1983 claims against the Individual Defendants for alleged constitutional violations under the First Amendment, as well as under the Due Process and Equal Protection Clauses. The complaint also alleged state law claims against all defendants for breach of contract and negligent infliction of emotional distress.

On December 14, 2017, the district court dismissed Radwan's state law claims against UConn and all of her claims against the Individual Defendants in their official capacities.[7] Following discovery, the defendants moved for summary

---

[6] Radwan subsequently retained counsel who represented her in the district court.

[7] Radwan does not challenge the dismissal of these claims on appeal. The district court did not dismiss Radwan's Title IX claim against UConn or her Section 1983 and state law claims against the Individual Defendants in their individual capacities. In the remainder of this opinion, therefore, for ease of reference, we use the term "Individual Defendants" to refer to the Individual Defendants solely in their individual capacities.

judgment on all remaining claims, and Radwan cross-moved for summary judgment on her First Amendment and due process claims.

On June 6, 2020, the district court granted summary judgment in favor of the defendants on all of the remaining claims. *Radwan v. Univ. of Conn. Bd. of Trs.*, 465 F. Supp. 3d 75, 114 (D. Conn. 2020). In particular, as relevant to this appeal, the district court granted summary judgment in favor of the Individual Defendants on the First Amendment and due process claims brought under Section 1983, and in favor of UConn on the Title IX claim.[8] *Id.* at 101, 107, 114.

With respect to the First Amendment claim, the district court determined that Radwan had a "viable First Amendment claim" because there were triable issues of fact as to whether she had engaged in expressive conduct protected by the First Amendment. *Id*. at 108–09. In particular, the district court concluded that, to the extent the defendants relied upon the standards for regulating student speech established by the Supreme Court in *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969), and *Hazelwood School District v. Kuhlemeier*, 484 U.S. 260 (1988), a reasonable jury could find that the decision to

---

[8] The district court also granted summary judgment to the Individual Defendants on the equal protection claim, as well as on the state law claims for breach of contract and negligent infliction of emotional distress. *Id.* at 101–05, 114. On appeal, Radwan does not challenge the grant of summary judgment on those claims.

21

cancel Radwan's scholarship was unjustified under these standards. *Radwan*, 465

F. Supp. 3d at 111–12. However, the district court granted summary judgment in

favor of Coach Tsantiris and AD Manuel on qualified immunity grounds because

they "could have reasonably believed they were justified in disciplining Ms.

Radwan for her expressive conduct broadcast on national television for all to see"

as vulgar speech that a school could prohibit under the Supreme Court's decision

in *Bethel School District No. 403 v. Fraser*, 478 U.S. 675 (1986). *Radwan*, 465 F. Supp.

3d at 112. Although acknowledging that *Fraser* involved a high school, and that

the Supreme Court and this Circuit have suggested that K-12 schools may differ

from the collegiate setting for purposes of First Amendment analysis, the district

court noted that "the specific facts in this case, involving expressive conduct

widely and publicly broadcast on national television, rather than limited to the

university setting, complicate the matter." *Id*. at 113. In short, the district court

concluded that the "lack of clearly established law under the *Fraser* standard"

entitled Coach Tsantiris and AD Manuel to qualified immunity on the First

Amendment claim. *Id*. at 111. In addition, the district court granted summary

judgment against FAD Lucas on the First Amendment claim because of her lack

22

of personal involvement in the decision to terminate Radwan's scholarship. *Id*. at 113–14.

As to the due process claim, the district court held that the Individual Defendants were entitled to summary judgment because Radwan "failed to establish that her contract for a one-year athletic grant-in-aid created a constitutionally protect[ed] property interest," as required to pursue a due process claim. *Id*. at 107. Given the absence of the requisite property interest, the district court noted that it did not need to reach the question of whether the process Radwan received was sufficient, but then alternatively concluded that "UConn did have a procedure for appealing the cancellation of Ms. Radwan's scholarship; she, however, did not timely appeal the decision." *Id*. Furthermore, the district court alternatively held that, "[e]ven if the Court did find a protected property interest in this case, the absence of binding caselaw would warrant dismissal of this constitutional claim under the doctrine of qualified immunity." *Id*. at 107 n.4.

With respect to the Title IX claim, the district court held that UConn was entitled to summary judgment because Radwan failed to provide evidence from which an inference of discriminatory motive could be drawn and, thus, did not establish a *prima facie* case under Title IX. *Id*. at 98–100. The district court reasoned

that, to the extent Radwan was attempting to raise such an inference by pointing to male student-athletes who received less severe penalties for misconduct, no reasonable jury could find that the male students were similarly situated to Radwan, including because they involved different decisionmakers at UConn. *Id*. at 98–99. In the alternative, the district court concluded that, even if Radwan established a *prima facie* case, UConn had articulated a legitimate, non-discriminatory reason for terminating Radwan's scholarship—namely, misconduct based upon her on-field gesture—and Radwan had failed to present sufficient evidence from which a rational trier of fact could find that her gender motivated that decision, given the absence of similarly situated male student-athletes at UConn. *Id*. at 100–01.

This appeal followed.

## II. DISCUSSION

After discussing the applicable standard of review, we first consider Radwan's First Amendment claim. Next, we assess her procedural due process claim. Finally, we analyze Radwan's Title IX claim.

### A. The Standard of Review

We review a grant of summary judgment *de novo*. *1077 Madison St., LLC v. Daniels*, 954 F.3d 460, 463 (2d Cir. 2020). In doing so, we "constru[e] the evidence in the light most favorable to the nonmoving party and draw[] all reasonable inferences in that party's favor." *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 358 (2d Cir. 2011). Granting summary judgment is required where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

### B. First Amendment Claim

The district court found that Radwan had raised a triable issue of fact as to whether the decision to terminate her scholarship because of her middle finger gesture on the soccer field violated her First Amendment rights, but granted summary judgment to Coach Tsantiris and AD Manuel on the ground of qualified immunity. *Radwan*, 465 F. Supp. 3d at 108–10. As set forth below, we affirm the

grant of summary judgment in favor of the Individual Defendants on qualified immunity grounds because, even assuming *arguendo* that the district court correctly concluded that issues of fact precluded summary judgment as to whether Radwan's speech was protected under the First Amendment, there was no clearly established law at the time of the scholarship termination (or even now) that would have placed the Individual Defendants on notice as to the unconstitutionality of their decision.[9]

### 1. Standard for Qualified Immunity

Under the two-part inquiry established by the Supreme Court, government officials are entitled to qualified immunity on a Section 1983 claim "unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). The Supreme Court has emphasized that lower courts are "permitted to exercise their

---

[9] We note that the district court granted summary judgment to FAD Lucas not on qualified immunity grounds, but rather because of a lack of evidence of her personal involvement in the termination decision. 465 F. Supp. 3d at 113–14. On appeal, Radwan does not specifically address the district court's decision on the First Amendment claim as it relates to FAD Lucas and, thus, appears to have abandoned any challenge to the grant of summary judgment to FAD Lucas on this claim. *See Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998). In any event, we conclude that FAD Lucas is entitled to summary judgment on qualified immunity grounds for the same reasons as are Coach Tsantiris and AD Manuel.

26

sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Here, on the First Amendment claim, we proceed directly to step two and hold that qualified immunity applies and, thus, avoid the "[u]nnecessary litigation of constitutional issues" at step one. *Id*. at 237.

A clearly established right is one that is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle*, 566 U.S. at 664 (internal quotation marks omitted and alteration adopted). "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). "This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (internal quotation marks omitted). "In determining if a right is clearly established, this Court looks to whether (1) it was defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has confirmed the existence of the right, and (3) a reasonable defendant would have understood that his conduct was unlawful." *Doninger v. Niehoff* (*Doninger II*), 642 F.3d 334, 345 (2d

Cir. 2011). Absent controlling authority, a plaintiff must show "a robust consensus of cases of persuasive authority." *De La Rosa v. White*, 852 F.3d 740, 746 (8th Cir. 2017) (quoting *al-Kidd*, 563 U.S. at 742). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Id.* at 346 (internal quotation marks omitted).

"[T]he absence of legal precedent addressing an identical factual scenario does not necessarily yield a conclusion that the law is not clearly established." *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 251 (2d Cir. 2001). "Indeed, it stands to reason that in many instances the absence of a reported case with similar facts demonstrates nothing more than widespread compliance with the well-recognized applications of the right at issue on the part of government actors." *Id.* (internal quotation marks omitted); *see id.* at 253 ("To the extent that no case applying this right in the educational setting has previously arisen in our circuit, we view this unremarkable absence as a strong indication that the right to be free from excessive force is so well-recognized and widely observed by educators in public schools as to have eluded the necessity of judicial pronouncement.").

28

As a threshold matter, we must identify the right alleged to have been violated. We have stated that "[c]haracterizing the right too narrowly to the facts of the case might permit government actors to escape personal liability, while doing so too broadly risks permitting unwarranted imposition of monetary liability." *Johnson*, 239 F.3d at 251. We identify the right at issue here to be the right of a student-athlete at a university, while in public and on the playing field, to make a vulgar or offensive comment or gesture without suffering disciplinary consequences.

### 2. Free Speech and Schools

In order to determine whether the defendants are protected by qualified immunity, we summarize some basic tenets of First Amendment law and the case authority applying those tenets to student speech, including more specifically in the university setting.

The protections of the First Amendment are not limited to spoken words, but rather include gestures and other expressive conduct, even if vulgar or offensive to some. For example, in *Cohen v. California*, 403 U.S. 15 (1971), the Supreme Court held that an individual wearing a jacket bearing the words "F**k the Draft" in a courthouse corridor could not be prosecuted for disturbing the peace. *Id.* at 16, 25–26; *see also Virginia v. Black*, 538 U.S. 343, 366–67 (2003) (holding

29

that cross burning without intent to intimidate was protected by the First Amendment).

Consistent with this precedent, although "the gesture generally known as 'giving the finger' . . . is widely regarded as an offensive insult," *Bad Frog Brewery, Inc. v. N.Y. State Liquor Auth.*, 134 F.3d 87, 91 (2d Cir. 1998), it is a gesture that is generally protected by the First Amendment. *See, e.g.*, *Cruise-Gulyas v. Minard*, 918 F.3d 494, 497 (6th Cir. 2019) ("Any reasonable [police] officer would know that a citizen who raises her middle finger engages in speech protected by the First Amendment."); *Garcia v. City of New Hope*, 984 F.3d 655, 669 (8th Cir. 2021) ("[Plaintiff's] raising his middle finger at [a police officer] is a rude and offensive gesture but nonetheless, under current precedent, is a constitutionally protected speech activity."); *Batyukova v. Doege*, 994 F.3d 717, 731 (5th Cir. 2021) (same); *accord Swartz v. Insogna*, 704 F.3d 105, 111 (2d Cir. 2013) (holding that giving the middle finger could not support arrest for disorderly conduct); *see generally* Ira P. Robbins, *Digitus Impudicus: The Middle Finger and the Law*, 41 U.C. DAVIS L. REV. 1403, 1407–08, 1434 (2008) (observing that the middle finger can express a variety of emotions—such as anger, frustration, defiance, protest, excitement—or even "possess[] political or artistic value").

However, it is well settled that K-12 schools, under certain circumstances, can regulate the content of student speech, including offensive speech, that would otherwise be protected if uttered or displayed by a member of the general public. *See Fraser*, 478 U.S. at 682 ("It does not follow . . . that simply because the use of an offensive form of expression may not be prohibited to adults making what the speaker considers a political point, the same latitude must be permitted to children in a public school.").

In *Fraser*, the Supreme Court held it was permissible for a school district to impose sanctions on a high school student for "his offensively lewd and indecent speech." *Id*. at 685; *see also id*. at 683 ("The pervasive sexual innuendo in Fraser's speech was plainly offensive to both teachers and students—indeed to any mature person. By glorifying male sexuality, and in its verbal content, the speech was acutely insulting to teenage girl students."). In doing so, the Supreme Court emphasized that "[t]he schools, as instruments of the state, may determine that the essential lessons of civil, mature conduct cannot be conveyed in a school that tolerates lewd, indecent, or offensive speech and conduct such as that indulged in by this confused boy." *Id.* at 683; *see also Doninger v. Neihoff* (*Doninger I*), 527 F.3d 41, 48 (2d Cir. 2008) ("Vulgar or offensive speech—speech that an adult making a

political point might have a constitutional right to employ—may legitimately give rise to disciplinary action by a [high] school, given the school's responsibility for teaching students the boundaries of socially appropriate behavior." (internal quotation marks omitted)). The Court distinguished the school's regulation of the offensive and lewd speech from the circumstances in *Tinker*, where the Court held that a school district could not discipline a student for wearing a black armband to school during the Vietnam War because the record "d[id] not demonstrate any facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities, and no disturbances or disorders on the school premises in fact occurred." 393 U.S. at 504, 514. The *Fraser* Court determined that, unlike the sanctions imposed in *Tinker*, the school's regulation of the student's lewd speech was "unrelated to any political viewpoint." 478 U.S. at 685. Thus, even in the absence of evidence of substantial disruption to the school, the Court concluded that "it was perfectly appropriate for the school to disassociate itself to make the point to the pupils that vulgar speech and lewd conduct is wholly inconsistent with the 'fundamental values' of public school education." *Id*. at 685–86. Indeed, the Court noted that, "[a]s cogently expressed by Judge Newman, 'the First Amendment gives a high school

student the classroom right to wear Tinker's armband, but not Cohen's ['F**k the draft'] jacket." *Id*. at 682–83 (quoting *Thomas v. Bd. of Educ., Granville Cent. Sch. Dist.*, 607 F.2d 1043, 1057 (2d Cir. 1979) (Newman, J., concurring); *see also id*. at 686 (noting as "especially relevant" the *Tinker* dissent's point that the Constitution does not require public schools to "surrender control" to students (quoting *Tinker*, 393 U.S. at 526)).

The Supreme Court has likewise made clear that high schools may, under certain circumstances, lawfully regulate student speech that is related to a school activity. For example, in *Hazelwood*, the Court held that high school officials did not violate the First Amendment when they censored certain articles in a school newspaper about pregnancy and divorce because the articles might reasonably be perceived by members of the school community and the public to "bear the imprimatur of the school." 484 U.S. at 271. The Court declined to apply the *Tinker* standard in such situations, reasoning as follows:

> [A] school may in its capacity as publisher of a school newspaper or producer of a school play disassociate itself, not only from speech that would substantially interfere with its work or impinge upon the rights of other students, but also from speech that is, for example, ungrammatical, poorly written, inadequately researched, biased or prejudiced, vulgar or profane, or unsuitable for immature audiences. A school must be able to set high standards for the student speech that is disseminated under its auspices—standards that may be

33

higher than those demanded by some newspaper publishers or theatrical producers in the "real" world—and may refuse to disseminate student speech that does not meet those standards.

*Id.* at 271–72 (internal citations and quotation marks omitted and alterations adopted). Similarly, in *Morse v. Frederick*, 551 U.S. 393 (2007), the Court held that a high school did not violate the First Amendment when it suspended a student for unfurling a banner that read "BONG HiTS 4 JESUS" at an off-campus, school-approved social event. *Id.* at 396–98. In particular, the Court emphasized that "the rule of *Tinker* is not the only basis for restricting student speech," *id.* at 406, and "a principal may, consistent with the First Amendment, restrict student speech at a school event, when that speech is reasonably viewed as promoting illegal drug use," *id.* at 403.

Moreover, in the recent case of *Mahanoy Area School District v. B.L. ex rel. Levy*, 141 S. Ct. 2038 (2021), although the Court held that a high school violated a student's First Amendment rights when it suspended her from the cheerleading squad for using vulgar language in a social media post, *id.* at 2048, the Court also "consider[ed] the school's interest in teaching good manners and consequently in punishing the use of vulgar language aimed at part of the school community," *id.* at 2047. In doing so, the Court emphasized, under the circumstances of that

particular case, "[t]he strength of this anti-vulgarity interest is weakened considerably by the fact that [the student] spoke outside the school *on her own time.*" *Id.* (emphasis added). Therefore, the Court continued to leave open the question as to the precise scope of a school's ability to regulate vulgar language or expression by a student while the student is representing the school at a school-sanctioned event.[10] *Id.* at 2046.

It is also important to note that these Supreme Court cases all addressed the First Amendment question in the context of students in public schools from grades K-12. Moreover, the Court has suggested that these holdings may not apply with equal force in college and university settings. *See Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 238 n.4 (2000) (Souter, J., concurring) (discussing

---

[10] We note that the Supreme Court's recent decision in *Kennedy v. Bremerton School District*, 142 S. Ct. 2407 (2022), which addressed the First Amendment rights of a coach while he remained on the field after a football game, is inapposite to the circumstances here and provides no additional guidance for resolving the constitutional issue presented in this case. In *Kennedy*, the Supreme Court held that a school district violated a high school football coach's First Amendment rights by disciplining him for kneeling at midfield after games to pray quietly. *Id.* at 2433. The decision hinged upon the coach's rights to religious exercises and expressive religious activities under the First Amendment. *Id.* at 2421 ("Where the Free Exercise Clause protects religious exercises, whether communicative or not, the Free Speech Clause provides overlapping protection for expressive religious activities."). Thus, the Supreme Court had no occasion to consider the contours of the First Amendment—in light of *Fraser*, *Hazelwood* and their progeny—as it relates to a student-athlete engaging in vulgar or offensive expression while representing the team at a school-sponsored athletic event.

*Hazelwood*, *Fraser*, and *Tinker*, and noting that these "cases dealing with the right of teaching institutions to limit expressive freedom of students have been confined to high schools, whose students and their schools' relation to them are different and at least arguably distinguishable from their counterparts in college education" (internal citations omitted)).

The Third Circuit has cogently summarized this dichotomy in the Supreme Court's First Amendment jurisprudence and explained that the application of the free speech principles may vary (in whole or in part) depending upon whether the setting is a public university or a public elementary or secondary school:

> Public universities have significantly less leeway in regulating student speech than public elementary or high schools. Admittedly, it is difficult to explain how this principle should be applied in practice and it is unlikely that any broad categorical rules will emerge from its application. At a minimum, the teachings of *Tinker*, *Fraser*, *Hazelwood*, *Morse*, and other decisions involving speech in public elementary and high schools, cannot be taken as gospel in cases involving public universities. Any application of free speech doctrine derived from these decisions to the university setting should be scrutinized carefully, with an emphasis on the underlying reasoning of the rule to be applied.

*McCauley v. Univ. of the V.I.*, 618 F.3d 232, 247 (3d Cir. 2010).

3.      Analysis

Radwan argues that "[i]t was clearly established as of December 22, 2014 that the First Amendment bars officials at public universities from punishing student speech on the basis of its viewpoint" and "[s]howing the middle finger—even if offensive—expresses a viewpoint."  Appellant's Br. at 15.  Radwan contends that the Supreme Court cases outlined above, which have allowed schools to regulate student speech—including *Fraser*, *Hazelwood*, and *Morse*—have no application here because those decisions apply only to children in public elementary and high schools, and not to students in public universities.  Radwan asserts, instead, that the Supreme Court's decision in *Papish v. Board of Curators of the University of Missouri*, 410 U.S. 667 (1973) (per curiam), "is on all fours with this case," and "Ms. Radwan's First Amendment rights were as clearly established as First Amendment rights can be."  Appellant's Br. at 30.  As set forth below, we disagree and hold that Radwan's free speech rights in this situation are not clearly established and that the Individual Defendants are therefore shielded from liability on the First Amendment claim under the doctrine of qualified immunity.

As a threshold matter, to the extent Radwan contends that the First Amendment claim in this case is controlled by *Papish*, we find that argument

37

unpersuasive. In *Papish*, the Supreme Court addressed the expulsion of a graduate student for distributing a newspaper called the *Free Press Underground* that contained materials that the university concluded violated its policy prohibiting "indecent conduct or speech." 410 U.S. at 668. More specifically, the newspaper at issue contained: (1) a political cartoon "depicting policemen raping the Statue of Liberty and the Goddess of Justice"; and (2) an article entitled "M----f---- Acquitted," which discussed an acquittal in an assault trial. *Id.* at 667–68.

*Papish* is readily distinguishable, however, as Ms. Papish was not speaking in the context of a school-sponsored event or activity. 410 U.S. at 667; *see also id.* at 675 (Rehnquist, J., dissenting) (referring to the space in which Ms. Papish "hawked *her* newspaper" (emphasis added)). The newspaper had been "sold on [the University's] campus for more than four years pursuant to an authorization obtained from the University Business Office," *id.* at 667 (majority opinion), but there is no indication in *Papish* that the school had any affiliation with the paper aside from extending the bare permission to sell it—much as a university might permit the *New York Times* to be sold on campus. In short, Ms. Papish was speaking "on her own time," *Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*, 141 S. Ct. 2038, 2047 (2021), even if she did so on the university's property.

Expelling a university student because of a disagreement with the content of an article in an independent student newspaper, as in *Papish*, is not the constitutional equivalent of disciplining a university student for displaying a vulgar or offensive gesture while playing for a university's sports team. In fact, in *Papish*, the Supreme Court emphasized that it had "repeatedly approved" of the legitimate authority of universities "to enforce reasonable regulations as to the time, place, and manner of [student] speech and its dissemination." 410 U.S. at 670 (citing *Healy v. James*, 408 U.S. 169, 192–93 (1972)). The Court then concluded that the facts "show clearly that [Papish] was expelled because of the disapproved *content* of the newspaper rather than the time, place, or manner of its distribution." *Id*.

Here, there is no indication that the Individual Defendants would have taken any disciplinary action against Radwan had she displayed the middle finger in some other university setting, such as a campus dormitory, classroom, or other student gathering. Instead, the Individual Defendants were regulating Radwan's ability to display a vulgar or offensive gesture as an athlete on the university's sports team, wearing the university's jersey, during a university sports event. And, contrary to Radwan's suggestion, such a situation is different from the use

39

of that gesture by a student in a quad celebrating the team's victory with classmates or wearing a vulgar T-shirt on campus. Unlike those students, Radwan's speech and conduct were subject to additional restrictions because she was: (1) required to comply with the codes of conduct agreed to by student-athletes as part of their participation on a university team and ability to receive a scholarship; (2) subject to the authority of the Athletic Department; and (3) officially representing the university in inter-collegiate play at a school-sanctioned event. *See generally Lowery v. Euverard*, 497 F.3d 584, 597 (6th Cir. 2007) ("[T]here is a difference between the way a school relates to the student body at large, and to students who voluntarily 'go out' for athletic teams . . . . Restrictions that would be inappropriate for the student body at large may be appropriate in the context of voluntary athletic programs."). There is nothing in the language of *Papish* that suggests that a university has no ability to regulate a student's offensive or vulgar speech in the particular context at issue here. *See Hazelwood*, 484 U.S. at 271 n.3 ("The distinction that we draw between speech that is sponsored by the school and speech that is not is fully consistent with [*Papish*], which involved an off-campus 'underground' newspaper that school officials merely had allowed to be sold on a state university campus."); *see also Healy*, 408 U.S. at 180 ("First Amendment rights

must always be applied 'in light of the special characteristics of the . . . environment' in the particular case." (quoting *Tinker*, 393 U.S. at 506)).

Similarly, to the extent that Radwan suggests that the Supreme Court has made clear that the holdings of *Fraser*, *Morse*, and *Hazelwood* do not apply at all in the university setting, we find insufficient support for that suggestion. Indeed, in *Hazelwood*, where the Court established that schools may regulate "student speech in school-sponsored expressive activities" that "members of the public might reasonably perceive to bear the imprimatur of the school," 484 U.S. at 271, 273, the Court explicitly left open the issue of whether that rule would apply at the university level, *see id*. at 273 n.7 ("We need not now decide whether the same degree of deference is appropriate with respect to school-sponsored expressive activities at the college and university level."). This language contradicts Radwan's assertion that the Supreme Court, fifteen years earlier in *Papish*, foreclosed the ability of universities to regulate offensive or vulgar speech by students representing the school at school-sanctioned events. *See also Amidon v. Student Ass'n of State Univ. of N.Y. at Albany*, 508 F.3d 94, 105 (2d Cir. 2007) ("[C]ases like *Hazelwood* explicitly reserved the question of whether the substantial deference shown to high school administrators was appropriate with respect to

41

school-sponsored expressive activities at the college or university level, where the relation between students and their schools is different and at least arguably distinguishable." (internal citations and quotation marks omitted)); *see also Oyama v. Univ. of Haw.*, 813 F.3d 850, 862–63 (9th Cir. 2015) ("While aspects of student speech doctrine are relevant here, the Supreme Court has yet to extend this doctrine to the public university setting. . . . This case presents no occasion to extend student speech doctrine to the university setting.").

Given the ambiguity in the Supreme Court's jurisprudence, we have generally noted that "[t]he law governing restrictions on student speech can be difficult and confusing, even for lawyers, law professors, and judges" and "[t]he relevant Supreme Court cases can be hard to reconcile, and courts often struggle to determine which standard applies in any particular case." *Doninger II*, 642 F.3d at 353; *see also Abbott v. Pastides*, 900 F.3d 160, 174–75 (4th Cir. 2018) ("As we and other courts have recognized, First Amendment parameters may be especially difficult to discern in the school context." (collecting cases)). The Supreme Court itself has commented on the difficulty of this judicial task. *See Morse*, 551 U.S. at 401 ("There is some uncertainty at the outer boundaries as to when courts should apply school speech precedents"); *see also id*. at 418 (Thomas, J., concurring) (noting

that the Court has not "offer[ed] an explanation of when [*Tinker*] operates and when it does not").

Particularly with respect to the application of these standards to vulgar or obscene speech in the university setting, the Third Circuit in *McCauley* is not the only lower court that has struggled to determine the precise boundaries of a university's lawful authority to regulate such speech. Indeed, some courts have held that *Hazelwood* applies at least to some extent in the university setting, but that view is not unanimous. *Compare Axson-Flynn v. Johnson*, 356 F.3d 1277, 1289 (10th Cir. 2004) ("[W]e hold that the *Hazelwood* framework is applicable in a university setting for speech that occurs in a classroom as part of a class curriculum."), *Keeton v. Anderson-Wiley*, 664 F.3d 865, 875–76 (11th Cir. 2011) (applying *Hazelwood* in university setting), *and Hosty v. Carter*, 412 F.3d 731, 735 (7th Cir. 2005) (en banc) ("We hold . . . that *Hazelwood*'s framework applies to subsidized student newspapers at colleges as well as elementary and secondary schools."), *with Kincaid v. Gibson*, 236 F.3d 342, 346 n.5 (6th Cir. 2001) (en banc) (noting, in finding a First Amendment violation, that *Hazelwood* had "little application" to a university's attempt to regulate content in a college yearbook);

*Student Gov't Ass'n v. Bd. of Tr. of Univ. of Mass.*, 868 F.2d 473, 480 n.6 (1st Cir. 1989) ("*Hazelwood* . . . is not applicable to college newspapers.").

Other courts, including this Court, have still not decided the issue. *See, e.g.*, *Collins v. Putt*, 979 F.3d 128, 134 n.3 (2d Cir. 2020) (applying *Hazelwood* to university setting because neither party argued otherwise); *Oyama*, 813 F.3d at 864 n.10 ("In determining that *Hazelwood* does not provide the appropriate framework for evaluating a First Amendment claim such as [the student's], we need not and do not decide whether the *Hazelwood* standard can ever apply in the context of student speech at the college and university level.").

Some courts also have extended *Fraser* to the university setting in holding that an institution of higher learning has the ability to discipline a college teacher or student for the use of vulgar language in certain situations. For example, in *Sasser v. Board of Regents of the University System v. Georgia*, No. 1:20-cv-4022-SDG, 2021 WL 4478743 (N.D. Ga. Sept. 30, 2021), a university released a student-athlete from its baseball team after the student, while a spectator at a university football game, used a racial slur to refer to one of the student football players. *Id.* at *1. The court noted that "[t]he bounds of [plaintiff's] First Amendment rights while

44

on his University's campus are defined by *Tinker* and *Fraser*." *Id*. at *6. The court

then concluded:

> [Plaintiff's] intentions aside, he used a racially offensive term to
> describe a fellow student and did so in front of other students at a
> school sponsored, on-campus event. [Plaintiff's] conduct more
> resembles the underlying conduct in *Fraser* than in *Tinker*, and
> Defendants were well within their authority as educators to discipline
> [plaintiff] for this speech. The Court need not find that [plaintiff's]
> statement was harassing or threatening to come to this conclusion.

*Id*.; *cf. Martin v. Parrish*, 805 F.2d 583, 585–86 (5th Cir. 1986) ("[*Fraser*] admittedly

involved a high school audience and it may be suggested that its justification for

speech restraints rests largely on this fact. Nevertheless, we view the role of higher

education as no less pivotal to our national interest . . . . To the extent that [plaintiff

teacher's] profanity was considered by the college administration to inhibit his

effectiveness as a teacher, it need not be tolerated by the college any more than

Fraser's indecent speech to the Bethel school assembly.").

Moreover, even with respect to the courts that have declined to apply

*Hazelwood* to a particular type of speech at the university level, those cases

involved student speech in other contexts, such as a student newspaper or

yearbook. We are aware of no court that has suggested that a university is

prohibited under the First Amendment from disciplining a student-athlete for

45

vulgar or offensive language/expressions while wearing the school's uniform at a school-sponsored athletic competition. Such a broad rule would deprive a university of the ability to ensure that its own student-athletes are engaged in good sportsmanship while representing the school in athletic competitions.[11] One of the amici in support of Radwan argues that "[e]ven if this Court determines that a university has greater leeway in disciplining students for extracurricular speech, as compared to purely private speech, the district court erred in holding that *Fraser* or any other K-12 caselaw provides the correct standard." ACLU Amicus Br. at 23–24 n.10; *see also id*. ("Whatever the scope of speech that might properly be

---

[11] Radwan notes that there is evidence in the record that she was disciplined because Coach Tsantiris and AD Manuel found her gesture embarrassing. However, that is an oversimplification of the explanation by the decisionmakers for the disciplinary sanction. For example, AD Manuel explained that Radwan's gesture was not just "embarrassing" and "unnecessary," but also "unsportsmanlike":

> That [gesture] is disrespectful to the competition that occurred. I didn't get into her mind and her rationale. But it is unsportsmanlike in the sense that it's disrespectful to the competition that you just engaged in[,] to yourself[,] and to the other team that participated with it. But at the time, I didn't, you know, get into that sort of sense of unsportsmanlike because to me it was just more of a reflection of her, her team, this university. But in the general sense of how I see unsportsmanlike behavior, yeah, that is.

Joint App'x at 384. Similarly, Coach Tsantiris testified that Radwan's gesture was "devastating" because it brought the focus on herself and her inappropriate behavior, rather than the team's victory and its successful season. *Id*. at 366; *see also id*. ("No other player in my then 34 years as UConn head coach had behaved this way. I felt that plaintiff's behavior was a blow to the team, the program and UConn.").

46

proscribed on the college field, it cannot be determined—as the district court suggested—by the standard set forth in *Fraser*."). Although we agree that the Supreme Court has suggested that its analyses in addressing the First Amendment in the public elementary and high school settings (including *Hazelwood* and *Fraser*) may not apply *equally* to the university setting, *see Southworth*, 529 U.S. at 238 n.4 (2000) (Souter, J., concurring), neither the Supreme Court nor any circuit court has yet provided an alternative legal standard or framework to help university administrators discern the precise constitutional line in such circumstances, especially when the student engages in speech while wearing the university's uniform as part of an extracurricular activity.

As a result, courts have not hesitated to grant qualified immunity to university officials who attempt to regulate speech at the university level in the uncertain waters of *Hazelwood*, *Fraser*, and other Supreme Court precedent. *See, e.g.*, *Hosty*, 412 F.3d at 738 (granting qualified immunity to university officials on First Amendment claim and noting that "[p]ost-*Hazelwood* decisions likewise had not 'clearly established' that college administrators must keep hands off all student newspapers"); *Sasser*, 2021 WL 4478743, at *6 (holding, in the alternative, that qualified immunity applied to university official's decision because "[d]isciplining

47

[the student] for using a racial slur around a crowd of students while attending a school event" was not "so clearly established [a constitutional violation] that every reasonable school official in the same circumstances would have known in light of preexisting law that his actions violated First Amendment rights" (internal quotation marks omitted)); *see also Hunt v. Bd. of Regents of Univ. of N.M.*, 792 F. App'x 595, 606 (10th Cir. 2019) (summary order) (finding that qualified immunity applied to university officials who sanctioned student for off-campus, online speech because "the Supreme Court's K-12 cases of *Tinker*, *Fraser*, *Hazelwood*, and *Morse* and its university cases of *Papish* and *Healy* fail to supply the requisite on-point precedent").

We reach the same conclusion here. In light of the absence of a decision by the Supreme Court or this Court on the application of the First Amendment to vulgar speech (or expression) by a university student while representing the university at a school-sponsored event, as well as the lack of any consensus among other courts on this issue, we conclude that the defendants are entitled to qualified immunity.[12] As the Supreme Court has emphasized, to find liability for a

---

[12] To the extent the district court suggested that the qualified immunity analysis may hinge upon the specific fact that the case "involv[ed] expressive conduct widely and publicly broadcast on national television, rather than limited to the university setting,"

constitutional violation "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Here, it would not be unreasonable for a university official to conclude that *Hazelwood* and other Supreme Court precedent allows that official to sanction a student for vulgar or obscene speech while the student is wearing the university's uniform at a school-sanctioned sporting event. In other words, existing precedent has certainly not placed this particular constitutional question "beyond debate." *al-Kidd*, 563 U.S. at 741.

Accordingly, we conclude that the Individual Defendants are entitled to summary judgment on qualified immunity grounds with respect to the First Amendment claim.[13]

---

*Radwan*, 465 F. Supp. 3d at 113, we do not view the amount of publicity to be the dispositive factor in the qualified immunity analysis.

[13] In a footnote in her brief on appeal, Radwan suggests, for the first time, that UConn's "serious misconduct" standard, which was the basis for the revocation of her scholarship, is unconstitutionally vague and overbroad. Appellant's Br. at 24 n.4. As a threshold matter, this argument is waived because it is raised before this Court only in a cursory, one-sentence footnote. *See Tolbert v. Queens Coll.*, 242 F.3d 58, 75 (2d Cir. 2001). In addition, we decline to consider this argument because it was not raised before the district court. *See Otal Invs. Ltd. v. M/V CLARY*, 673 F.3d 108, 120 (2d Cir. 2012).

## C.    Procedural Due Process

Radwan also alleges that the Individual Defendants violated her constitutional rights under the Due Process Clause by failing to provide her with sufficient process in the termination of her one-year scholarship.

"A procedural due process claim is composed of two elements:  (1) the existence of a property or liberty interest that was deprived and (2) deprivation of that interest without due process."  *Bryant v. N.Y. State Educ. Dep't*, 692 F.3d 202, 218 (2d Cir. 2012).  With respect to the first element, Radwan contends that Connecticut law created a constitutionally protected property interest in her athletic scholarship because her contract with UConn (1) had a set duration (one year) and (2) contained a for-cause termination provision.

As an initial matter, we disagree with the district court that Radwan's one-year athletic scholarship was not a constitutionally protected property interest.  Instead, we conclude that because Radwan's scholarship was guaranteed for a fixed term and terminable only for cause, it was a property interest protected by the Constitution.  However, because this rule was not clearly established at the time Radwan's scholarship was terminated, we conclude that defendants are entitled to qualified immunity on this claim as well.

As with the First Amendment claim, we apply a two-step test for determining whether qualified immunity bars Radwan's due process claim. *Wesby*, 138 S. Ct. at 589 (holding that government officials are entitled to qualified immunity "unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time" (internal quotation marks omitted)). Moreover, as noted *supra*, a court need not address the merits of the statutory or constitutional right at step one if qualified immunity exists based on step two. We recognize that there are often sound reasons, including standard principles of constitutional avoidance, to forgo analysis of the constitutional question if qualified immunity applies because any such constitutional right was not clearly established, as we did with respect to Radwan's First Amendment claim. *See, e.g.*, *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988) ("A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them."); *see also Camreta v. Greene*, 563 U.S. 692, 707 (2011) ("In general, courts should think hard, and then think hard again, before turning small cases into large ones."). However, the Supreme Court also has emphasized that "it remains true that following the two-step sequence—

51

defining constitutional rights and only then conferring immunity—is sometimes

beneficial to clarify the legal standards governing public officials." *Camreta*, 563

U.S. at 707; *see also Pearson*, 555 U.S. at 236 (outlining factors that may support

addressing a constitutional question even when qualified immunity exists); *accord*

*Costello v. City of Burlington*, 632 F.3d 41, 47 (2d Cir. 2011) (quoting *Pearson* for the

proposition that "there are cases in which there would be little if any conservation

of judicial resources to be had by beginning and ending with a discussion of the

'clearly established' prong").

Notwithstanding the existence of qualified immunity at step two, we

conclude that the unsettled nature of the "property interest" issue in the due

process claim presents precisely such a situation. Failing to rule on this threshold

constitutional question "may frustrate 'the development of constitutional

precedent' and the promotion of law-abiding behavior." *Camreta*, 563 U.S. at 706

(quoting *Pearson*, 555 U.S. at 237). Moreover, our ruling on the "property interest"

issue involves a straight-forward analysis that does not waste scarce judicial

resources and undoubtedly will provide useful guidance to public officials in

connection with future terminations of fixed-term athletic scholarships.[14] *See, e.g.,*

---

[14] The policies weighing in favor of considering the merits of the "property interest" issue were absent from Radwan's First Amendment claim or the adequacy of the particular

*Francis v. Fiacco*, 942 F.3d 126, 140–41 (2d Cir. 2019) (addressing the merits of one of plaintiff's constitutional questions and declining to address the merits of a separate constitutional question, even though qualified immunity existed for both claims); *accord Costello*, 632 F.3d at 47 (deciding the constitutional question in order to provide future guidance to parties, as "[t]his is not a case in which prudence counsels kicking the can down the road"). Therefore, we address the merits of the "property interest" issue before proceeding to explain why summary judgment is warranted on qualified immunity grounds because the existence of this "property interest" in the context of a fixed-term athletic scholarship was not clearly established at the time of the scholarship revocation in this case.

---

procedures utilized by UConn in connection with Radwan's due process claim. Both of those issues would require an expenditure of substantial judicial resources to address and, in contrast to the "property interest" question, are extremely fact-specific determinations that would be of limited value to public officials and future litigants in First Amendment or procedural due process cases involving universities. *See Evans v. Skolnik*, 997 F.3d 1060, 1065 (9th Cir. 2021) (noting that, although addressing the merits "'is intended to further the development of constitutional precedent, opinions following that procedure often fail to make a meaningful contribution to such development,' particularly where the constitutional question is 'so factbound that the decision provides little guidance for future cases.'" (quoting *Pearson*, 555 U.S. at 237)); *see also Coollick v. Hughes*, 699 F.3d 211, 219–20 (2d Cir. 2012) (emphasizing that we "have discretion to decide which of the two prongs of qualified-immunity analysis to tackle first" and noting that "[d]eciding a case under prong two saves scarce judicial resources by avoiding unnecessary decisions" and "may also be preferable" when "our deciding the case under prong one could create a risk of bad decisionmaking" (internal quotation marks omitted)).

1. "Property Interest"

"To determine whether a plaintiff was deprived of property without due process of law in violation of the Fourteenth Amendment, we must . . . identify the property interest involved." *Taravella v. Town of Wolcott*, 599 F. 3d 129, 133 (2d Cir. 2010) (internal quotation marks omitted). Such property interests are typically not created by the Constitution, but instead "by an independent source such as state statutes or rules entitling the citizen to certain benefits." *Goss v. Lopez*, 419 U.S. 565, 572–73 (1975); *accord Martz v. Inc. Vill. of Valley Stream*, 22 F.3d 26, 30 (2d Cir. 1994) ("When determining whether a plaintiff has a claim of entitlement, we focus on the applicable statute, contract or regulation that purports to establish the benefit."). For a plaintiff to have a protected property interest, she "must have more than an abstract need or desire for it. [Sh]e must have more than a unilateral expectation of it. [Sh]e must instead, have a legitimate claim of entitlement to it." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972).

This Court has been "reluctant to surround the entire body of public contract rights with due process protections." *S & D Maint. Co. v. Goldin*, 844 F.2d 962, 967 (2d Cir. 1988). Because "not every contractual benefit rises to the level of a constitutionally protected property interest," we look at whether the interest

54

involved is protected under state law and "weigh the importance to the holder of the right." *Ezekwo v. N.Y.C. Health & Hosps. Corp.*, 940 F.2d 775, 782–83 (2d Cir. 1991) (internal quotation marks omitted). In the employment context, protected property interests may exist where there is an expectation that the relationship will continue for a period of time, *see, e.g., Perry v. Sindermann*, 408 U.S. 593, 602 (1972), or where the interest may not be terminated without cause, *see, e.g., O'Connor v. Pierson*, 426 F.3d 187, 196 (2d Cir. 2005) ("[T]he state-law property interest of government employees who may only be discharged for cause . . . is a constitutionally protected property interest for purposes of the Fourteenth Amendment."). Under Connecticut law, employment is at-will unless a contract specifies the right to be terminated only for cause. *Taravella*, 599 F.3d at 134. However, in *Taravella*, we noted that there is an exception when a contract establishes a fixed period of employment, and accordingly, concluded that a town employee had a property interest in a one-year employment contract that did not contain a for-cause provision. *Id.* (citing *Slifkin v. Condec Corp.*, 538 A.2d 231, 236 (Conn. App. Ct. 1988)).

Moreover, we have previously found that certain contractual rights in an educational context may create the sort of reliance that gives rise to a

constitutionally protected property interest and even, in certain circumstances, go further than an average employment contract. In *Ezekwo*, we held that a physician in a residency program had a protected property interest in a rotating four-month position as chief resident, noting that, aside from the specific contractual right guaranteeing the position, the position itself was of "special importance because it denotes the culmination of years of study." 940 F.2d at 783.

Applying those principles here, we hold that Radwan's one-year athletic scholarship—because it was for a fixed period and terminable only for cause, and because Radwan reasonably expected to retain the scholarship's benefits for that set period—created a contractual right that rose to the level of a constitutionally protected property interest.

First, it is inarguable that Radwan's scholarship was for a set term of one year, terminable only for cause. The for-cause contractual termination provision appeared in three sources—(1) Radwan's financial aid agreement, (2) UConn's Student-Athlete Handbook, and (3) UConn's adoption of NCAA regulations[15]—

---

[15] For example, Radwan's financial aid agreement states that her financial aid award "will not be increased, reduced or canceled during the period of its award on the basis of [her] athletics ability, performance or contribution to the team's success, because of injury or illness that prevents [her] from participating in athletics, or for any other athletics reason," but instead, only for a violation of certain terms, including for "serious misconduct that brings substantial disciplinary penalty." Joint App'x at 58–59; *see also id.*

with at least one being approved or signed by each of the Individual Defendants. *See S & D Maint*, 844 F.2d at 967–68 (finding contracts that are terminable for cause create a constitutionally protected property interest). Thus, when she signed up, Radwan reasonably expected to retain the benefits of her scholarship over a fixed period, engendering the type of reliance protected by due process. *See generally Goss*, 419 U.S. 565 at 573 ("[A] state employee who under state law, or rules promulgated by state officials, has a legitimate claim of entitlement to continued employment absent sufficient cause for discharge may demand the procedural protections of due process.").

Second, Radwan's reliance upon her scholarship further establishes that it is a constitutionally protected interest. Radwan exhibited a general dependence on her scholarship, relying upon it as her exclusive source of funding for housing, college tuition, and books, as is common for many collegiate athletes.[16] *See Roth*,

---

at 82 ("Once a grant-in-aid is awarded, the University is committed to fulfilling its financial obligation to you until your eligibility is exhausted. However, please remember that athletics grants are one-year, renewable awards. Grants-in-aid may be canceled or reduced during the period of the award" only for certain enumerated violations).

[16] Further, Coach Tsantiris's recommendation that Radwan attend community college classes in lieu of returning to UConn suggests that he knew the extent to which she relied upon her scholarship, and knew also that she would have been unable to remain at UConn without it.

408 U.S. at 577 ("It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined."); *see generally Nat'l Collegiate Athletic Ass'n v. Alston*, 141 S. Ct. 2141, 2148–51 (2021) (reviewing the history of compensation for collegiate athletes and acknowledging the commercial nature of collegiate sports). Further, similar to the chief resident position at issue in *Ezekwo*, an athletic scholarship is the result of years of practice and dedication and, "due in large part to the very nature" of athletics, is in and of itself significant because of the general professional value of a college education (which might be financially unavailable to a student in the absence of the scholarship) and the benefits of playing on a varsity sports team, where working together and discipline are developed.[17] *Ezekwo*, 940 F.2d at 783. Accordingly, we conclude that Radwan's reliance and dependence on her set contractual term created a legitimate claim of entitlement to her athletic scholarship. *Roth*, 408 U.S. at 577.

The Individual Defendants' arguments to the contrary are unavailing. The Individual Defendants first claim that the mere fact that Radwan's scholarship was

---

[17] Of note, only two percent of high school athletes nationwide are granted athletic scholarships, let alone full scholarships, to compete in college. *Scholarships*, NAT'L COLLEGIATE ATHLETIC ASS'N, http://www.ncaa.org/student-athletes/future/scholarships (last visited September 1, 2022).

subject to renewal does not convert her contract into a protected property interest. However, although a *subjective expectancy of renewal* is not protected by due process, *Perry*, 408 U.S. at 603, Radwan is not claiming she suffered a deprivation stemming from non-renewal of her scholarship. Instead, she asserts without objection that her contract was cut short six months into its fixed one-year term. Thus, this appeal does not concern Radwan's subjective expectancy of renewal, but rather, her reliance and dependence on her fixed, contractual benefit in her one-year scholarship.[18] *See Taravella*, 599 F.3d at 131–34 (finding a protected property interest in a one-year position).

The Individual Defendants further claim that because Radwan's athletic scholarship could be "immediately reduced or cancelled during the term of the award if plaintiff engaged in serious misconduct," the scholarship did not create the "dependence" or "permanence" necessary to create a constitutionally protected property interest. Appellees' Br. at 36–37. However, what the Individual Defendants refer to is merely a for-cause provision; taking their

---

[18] Further, we reject the Individual Defendants' suggestion that a term length of only one year could not give rise to a property interest, as property interests are defined not only by length, but also by their protection under state law and the plaintiff's reliance upon them. *See Ezekwo*, 940 F.2d at 783 (finding a protected property interest in a four-month position); *Taravella*, 599 F.3d at 134 (finding a protected property interest in a one-year position).

argument at face value would require us to find, contrary to our precedent, that any contract containing a for-cause provision could not produce the reliance necessary to acquire constitutional protection. Moreover, coupled with the Individual Defendants' assertion that termination of Radwan's scholarship "did not affect her right to continued enrollment at UConn," Appellee's Br. at 37, this argument both mischaracterizes the level of dependence necessary to give rise to a protected interest and ignores the unique nature of an athletic scholarship. As discussed above, Radwan's athletic scholarship was more than just a source of funding for her education; instead, it was of significant value to her future education and professional opportunities. *See Ezekwo*, 940 F.2d at 783 (noting that, due "to the very nature of medical training," the plaintiff's interest in the Chief Resident position was "of special importance" and "more than merely financial"). Indeed, Radwan's scholarship exhibits both sufficient "dependence" *and* "permanence," either of which may be sufficient for a constitutionally protected property interest to arise. *See S & D Maint.*, 844 F.2d at 966 (constitutional protection of public contracts rights is appropriate where "procedural protection is sought in connection with a state's revocation of a *status*, an estate within the public sphere characterized by a quality of either extreme dependence in the case

60

of welfare benefits, or permanence in the case of tenure, or sometimes both, as frequently occurs in the case of social security benefits"). Indeed, these factors distinguish this case from those in which courts have held that there is no general right to participation in intercollegiate athletics. *See, e.g.*, *Equity in Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 109 (4th Cir. 2011) ("[T]he interest of the student athletes in participating in intercollegiate sports was not constitutionally protected."); *Miami Univ. Wrestling Club v. Miami Univ.*, 302 F.3d 608, 615 (6th Cir. 2002) ("There is no constitutional right to participate in intercollegiate athletics.").

In sum, we hold that Radwan possessed a constitutionally protected property interest in her fixed-term athletic scholarship that could be terminated only for cause. We emphasize that we do *not* address whether the prospective renewal of an athletic scholarship would rise to the level of a protected property interest.

In light of this constitutionally protected property interest, Radwan asserts that UConn violated her due process rights by providing her with no pre-deprivation notice, hearing, or opportunity to be heard, and by failing to provide a neutral decisionmaker. However, we need not address that issue. Even assuming *arguendo* that Radwan did not receive the process she was due, we

nevertheless conclude that the district court properly granted summary judgment on qualified immunity grounds. We do so because no precedent in this Circuit or in the Supreme Court has conclusively established that student-athletes have a constitutionally protected property interest in athletic scholarships.

2. Qualified Immunity

Due process claims are a "particularly fertile ground for qualified immunity, given that state officials can be liable only for violations of rights that have been established beyond debate and with particularity by existing constitutional precedents." *Francis*, 942 F.3d at 149 (internal quotation marks omitted and alterations adopted). "[I]t will be a rare case in which prior precedents have definitively resolved a novel claim of procedural due process." *Id.* Radwan has presented such a novel claim; this Court has never held that an athletic scholarship creates a constitutionally protected right.

Therefore, even though we now hold that a fixed-term athletic scholarship terminable only for cause gives rise to a constitutionally protected property right, qualified immunity protects the Individual Defendants here from liability. *See id.* (identifying "a constitutional violation pursuant to such an analysis," but

"conclud[ing] that qualified immunity protects the State Defendants from damages liability under the circumstances of this particular case").

That does not end our inquiry, however, as even without any controlling authority, a "robust consensus" could have sufficed to have clearly established such a property right. *De La Rosa*, 852 F.3d at 746. But no such consensus exists. As an initial matter, over the years courts have rejected the notion that an individual has a general right to play or participate in collegiate athletics. *See, e.g.*, *Equity in Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 109 (4th Cir. 2011) (noting courts "have consistently held that the interest of the student athletes in participating in intercollegiate sports was not constitutionally protected" (internal quotation marks omitted)); *Spath v. Nat'l Collegiate Athletic Ass'n.*, 728 F.2d 25, 28–29 (1st Cir. 1984) (refusing to recognize a "right to play" hockey); *Colo. Seminary (Univ. of Denver) v. Nat'l Collegiate Athletic Ass'n*, 570 F.2d 320, 321 (10th Cir. 1978) (per curiam) (affirming the trial court's ruling "that the interest of the student athletes in participating in intercollegiate sports was not constitutionally protected, and that no constitutionally protected right of the University had been violated"); *Parish v. Nat'l Collegiate Athletic Ass'n,*, 506 F.2d 1028, 1034 (5th Cir. 1975) ("[W]e have held that the privilege of participating in interscholastic athletics

63

must be deemed to fall . . . outside the protection of due process" (internal quotation marks omitted)), *abrogated on other grounds as recognized in McCormack v. Nat'l Collegiate Athletic Ass'n*, 845 F.2d 1338, 1346 (5th Cir. 1988); *cf. Hysaw v. Washburn Univ. of Topeka*, 690 F. Supp. 940, 945 (D. Kan. 1987) (declining "to equate government employment with a football scholarship" and noting that "[p]laintiffs have offered no reason why a right to pursue a collegiate athletic career should be afforded the same status [as a constitutionally protected right], and the court likewise sees no reason to do so."). *But see Hall v. Univ. of Minn.*, 530 F. Supp. 104, 107–08 (D. Minn. 1982) (recognizing a due process right in attending a university in part based on the student's "private interest" through his participation in intercollegiate basketball in obtaining a "no cut" contract with the NBA); *cf. Duffley v. N.H. Interscholastic Athletic Ass'n, Inc.*, 446 A.2d 462, 466–67 (N.H. 1982) ("[P]laintiff has no fundamental constitutional right to participate in interscholastic athletics," but "we hold that the right of a student to participate in interscholastic athletics is one that is entitled to the protections of procedural due process under Part I, Article 15 of our State Constitution").

In contrast, there is no similar consensus that there is a due process right associated with an athletic scholarship. Although some courts have observed that

plaintiffs may, in certain circumstances, possess a constitutionally protected property interest in maintaining such a scholarship, most have not squarely decided the issue. *See, e.g., Austin v. Univ. of Or.*, 925 F.3d 1133, 1139 (9th Cir. 2019) (assuming without deciding that "student athletes have property and liberty interests in their education [and] scholarships"); *Heike v. Guevara*, 519 F. App'x 911, 924 (6th Cir. 2013) (summary order) (assuming without deciding that plaintiff had a property interest in her athletic scholarship); *Equity in Athletics*, 639 F.3d at 109, 109 n.15 (suggesting that individual athletes could have property interests "with respect to lost scholarships," but noting that the issue was not before the court); *cf. Fluitt v. Univ. of Neb.*, 489 F. Supp. 1194, 1203 (D. Neb. 1980) (noting that an expected renewal of an athletic scholarship "would not seem to be the type of property interest which the plaintiff could have relied upon until he was actually notified that he had received a scholarship").

Moreover, to the extent that Radwan relies on our decisions in *Taravella* or *Ezekwo* to argue that her property interest in her athletic scholarship was clearly established, she overlooks the "flexible, context-dependent approach" that a due process analysis requires. *Fiacco*, 942 F.3d at 149. Although we now apply the principles articulated in those cases to conclude that Radwan has a constitutionally

protected interest in her scholarship, *Taravella* and *Ezekwo* are too factually and contextually dissimilar from the issue before us for Radwan to overcome qualified immunity. *See White v. Pauly*, 137 S. Ct. 548, 552 (2017) (reiterating "the longstanding principle that clearly established law should not be defined at a high level of generality . . . [and] must be particularized to the facts of the case" (internal quotation marks and citations omitted)).

In sum, at the time of the termination of Radwan's scholarship, no clear rule had been enunciated that could have alerted the Individual Defendants that Radwan had a constitutionally protected property right established beyond debate. Thus, as it was not clearly established that an athletic scholarship creates a constitutionally protected interest, the Individual Defendants are entitled to qualified immunity, and we accordingly affirm the district court's grant of summary judgment as to Radwan's due process claim.

## D. Title IX

Radwan also asserts a Title IX claim in which she alleges that her scholarship was terminated on the basis of her sex. The district court determined that Radwan failed to present any evidence of male student-athletes at UConn similarly situated to her who received better treatment as it related to alleged misconduct, or any

66

other evidence suggesting discriminatory intent by UConn, and, accordingly, granted summary judgment to UConn. *Radwan*, 465 F. Supp. 3d at 101. As set forth below, we disagree and hold that the evidence, taken as a whole and construed most favorably to Radwan as the non-moving party, is sufficient to create genuine issues of material fact as to whether Radwan received a more serious disciplinary sanction at UConn because of her gender.

1. Standard for Title IX

In relevant part, Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). We have divided claims by "[p]laintiffs attacking a university disciplinary proceeding on grounds of gender bias" into two categories. *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994). We have explained these categories as follows:

> In the first category, the claim is that the plaintiff was innocent and wrongly found to have committed an offense. In the second category, the plaintiff alleges selective enforcement. Such a claim asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender.

*Id.* In this case, Radwan pursues only a theory of selective enforcement.

67

Title VII's burden-shifting framework generally guides our analysis of claims brought under Title IX. *Doe v. Columbia Univ.*, 831 F.3d 46, 55–56 (2d Cir. 2016). That familiar framework requires a plaintiff to make out a *prima facie* case (plaintiff is a member of a protected class, she was qualified for her position, she suffered an adverse action, and the facts imply a discriminatory intent), before the burden shifts to the defendant to proffer a legitimate non-discriminatory reason for the adverse action, and then finally, the plaintiff may rebut this reason by demonstrating pretext. *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000). In other words, "the plaintiff must demonstrate that the proffered reason was not the true reason (or in any event not the sole reason) for the [adverse action], which merges with the plaintiff's ultimate burden of showing that the defendant intentionally discriminated against her." *Littlejohn v. City of New York*, 795 F.3d 297, 307–08 (2d Cir. 2015).

In 1991, Congress amended Title VII to make clear that, with respect to a discrimination claim, a plaintiff can prove causation by demonstrating that discrimination was a "motivating factor" in the unlawful employment practice, even if it was not the only factor—often referred to as a "mixed motive" case. *See* Civil Rights Act of 1991, Pub. L. No. 102-166, § 107(a), 105 Stat. 1071 (codified as

68

amended at 42 U.S.C. § 2000e–2(m)); *see also Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85–86 (2d Cir. 2015).

Although Title VII caselaw often provides a useful framework for analyzing Title IX claims, the Supreme Court has acknowledged the need to depart from Title VII standards in the Title IX context when the statutory text or particular facts of a case so require. *See Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005) (contrasting Title IX and Title VII and acknowledging that the comparison may be of "limited use"); *see also Cohen v. Brown Univ.*, 101 F.3d 155, 176 (1st Cir. 1996) ("It does not follow from the fact that [Title IX] was patterned after a Title VII provision that Title VII standards should be applied to a Title IX analysis of whether an intercollegiate athletics program equally accommodates both genders . . . ."); *cf. North Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 521 (1982) ("There is no doubt that if we are to give Title IX the scope that its origins dictate, we must accord it a sweep as broad as its language." (internal quotation marks omitted and alterations adopted)). In no small part, the difference between interpretations of these statutes exists because "athletics presents a distinctly different situation from admissions and employment and requires a different analysis in order to determine the existence *vel non* of discrimination." *Cohen*, 101 F.3d at 177.

Therefore, although we look to Title VII cases for guidance, we retain the flexibility to depart from that guidance when appropriate.

With respect to the causation element under Title IX, although we have suggested that, as in a discrimination claim under Title VII, causation is demonstrated "where gender is a motivating factor in the decision to discipline," *Yusuf*, 35 F.3d at 715, the Supreme Court has since held that similar language in other contexts, such as discrimination claims under 42 U.S.C. § 1981 and retaliation claims under Title VII, requires proof of "but-for" causation. *See Comcast Corp. v. Nat'l Ass'n. of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020) (holding that, to prevail under Section 1981, "a plaintiff must initially plead and ultimately prove that, but for race, it would not have suffered the loss of a legally protected right"); *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 351–52 (2013) (holding that application of the "'because' of" requirement of Title VII's antiretaliation provision requires proof of "but-for" causation); *see also Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731, 1739 (2020) ("[T]he ordinary meaning of 'because of' is 'by reason of' or 'on account of.' In the language of law, this means that Title VII's 'because of' test incorporates the 'simple' and 'traditional' standard of but-for causation." (internal quotation marks and citations omitted)). However, even under the more stringent

70

"but-for" standard, "a defendant cannot avoid liability just by citing some *other* factor that contributed to its challenged employment decision. So long as the plaintiff's sex was one but-for cause of that decision, that is enough to trigger the law." *Bostock*, 140 S. Ct. at 1739.

We have not revisited this issue under Title IX in the wake of this Supreme Court precedent. *See Holcomb v. State Univ. of N.Y. at Fredonia*, 698 F. App'x 30, 31 (2d Cir. 2017) (summary order) (declining to decide whether "but-for" causation applies to Title IX's antiretaliation provision). In light of this Supreme Court precedent and its own precedent, the Fourth Circuit has held that the "on the basis of sex" language in Title IX requires "but-for" causation for claims alleging discriminatory school disciplinary proceedings. *Sheppard v. Visitors of Va. State Univ.*, 993 F.3d 230, 236–37 (4th Cir. 2021). More specifically, the Fourth Circuit explained that, although Congress expressly amended Title VII in the Civil Rights Act of 1991 to include the "motivating factor" standard for discrimination claims under that statute, it did not do so for Title IX and, thus, the court was "constrained to the text of Title IX and [Fourth Circuit] binding precedent interpreting the same or similar language." *Id*. at 237 n.7. *But see Doe v. Princeton Univ.*, 30 F.4th 335, 343–44 (3d Cir. 2022) (utilizing, on an appeal from a motion to dismiss, a

71

"motivating factor" standard under Title IX without addressing *Nassar* or other Supreme Court precedent).

However, we need not address this issue here because Radwan concedes that the "but-for" standard applies to her Title IX claim and, in any event, we conclude that Radwan's proof is sufficient to preclude summary judgment even under that higher standard.

## 2. Similarly Situated Individuals

Under Title VII, discriminatory intent can be shown by either direct evidence of discriminatory animus or circumstantial evidence of such animus, including by showing disparate treatment among similarly situated employees. *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000). "'[T]he standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical.' In other words, the comparator must be similarly situated to the plaintiff 'in all material respects.'" *Ruiz v. County of Rockland*, 609 F.3d 486, 494 (2d Cir. 2010) (quoting *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997)); *see also Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000) ("That an employee's conduct need not be identical to that of another for the

two to be similarly situated is also reflected in the language of *McDonnell Douglas*, where the Supreme Court used the phrase 'comparable seriousness' to identify conduct that might help to support an inference of discrimination." (internal citation omitted)). "What constitutes 'all material respects' therefore varies somewhat from case to case and . . . must be judged based on (1) whether the plaintiff and those [s]he maintains were similarly situated were subject to the same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness." *Graham*, 230 F.3d at 40 (internal citation omitted). "The determination that two acts are of comparable seriousness requires—in addition to an examination of the acts—an examination of the context and surrounding circumstances in which those acts are evaluated." *Id.* "Ordinarily, the question whether two employees are similarly situated is a question of fact for the jury." *Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003).

Likewise, under Title IX, to support a claim of selective enforcement using this type of evidence, a female student must show that a male student in circumstances sufficiently similar to her own was treated more favorably by the university. *See generally Yusuf*, 35 F.3d at 714–16; *see also Haidak v. Univ. of Mass.-*

73

*Amherst*, 933 F.3d 56, 74 (1st Cir. 2019) (citing *Yusuf* and analyzing whether a plaintiff had sufficiently pled that a similarly situated student of the opposite gender was treated more favorably).

3. Analysis

As the district court stated, for purposes of summary judgment, UConn disputes only whether Radwan has satisfied the fourth prong of a *prima facie* case under Title IX—that is, whether there is evidence supporting an inference of discriminatory intent. *See Radwan*, 465 F. Supp. 3d at 97. The district court held that Radwan did not submit evidence of more favorable treatment of similarly situated male student-athletes at UConn, who were alleged to have engaged in misconduct, that could raise an inference of discriminatory intent, nor did she present any other evidence that could provide such an inference. *Id.* at 99–100. The district court also concurred in UConn's alternative argument that, even if Radwan demonstrated a *prima facie* case, she had failed to submit sufficient evidence to demonstrate discriminatory intent in light of UConn's non-discriminatory justification for its decision—namely, that Radwan's vulgar gesture constituted serious misconduct. *Id.* at 100–01. More specifically, the district court noted that, "in the absence of comparators similarly situated to her

74

or any other evidence that her gender affected the decision of her coach or UConn, no reasonable jury could find that UConn had discriminated against her under Title IX." *Id.* at 101.

We disagree. Radwan has set forth several categories of evidence to support her Title IX claim, including evidence about: (1) the treatment of male student-athletes at UConn, who engaged in misconduct and received a lesser disciplinary sanction; (2) inconsistent reasons for the level of punishment for Radwan that were articulated by several UConn officials, as well as varying assessments over time by UConn officials regarding the seriousness of Radwan's misconduct and the need for additional punishment beyond her suspension from the NCAA tournament and the AAC's letter of reprimand; and (3) alleged failures by UConn to properly apply its own internal disciplinary procedures to Radwan's misconduct. We conclude that this evidence was sufficient to satisfy Radwan's *prima facie* burden and ultimately to preclude summary judgment on the Title IX claim, notwithstanding UConn's non-discriminatory justification for the termination of her scholarship.

To be sure, UConn contends that the male student-athlete comparators at UConn cited by Radwan were not similarly situated to her, and also disputes her

assertions that its officials gave inconsistent reasons for their decision and failed to follow their own internal disciplinary procedures for terminating her scholarship. However, as set forth below, these factual disputes collectively preclude summary judgment, and the weighing of the evidence (including the competing reasonable inferences that could be drawn from such evidence) must be resolved by a jury in this case.

### a. Evidence of Disparate Treatment of UConn Male Student-Athletes

Radwan points to evidence in the record of male student-athletes at UConn who she contends were subject to the same or similar standards as she was, engaged in similar or more serious misconduct, and who faced lesser or no discipline from UConn.

One incident involved a male football player at UConn on a full athletic scholarship, Andrew Adams, who kicked a dead ball into the stands during a game in Utah against Brigham Young University ("BYU"), incurring a fifteen-yard penalty against the team for his "unsportsmanlike conduct." Joint App'x at 625. Adams received no discipline from UConn for that misconduct.

Construing this evidence most favorably to Radwan, a reasonable juror could conclude that Adams was similarly situated to Radwan in all material

76

respects, but received more favorable treatment as to the alleged misconduct. Both student-athletes were on full scholarships, both engaged in what was defined as unsportsmanlike conduct,[19] and both engaged in such conduct in public, while in uniform on the playing field. Further, both were first-time offenders, AD Manuel was personally aware of both incidents, and both student-athletes later expressed remorse. Indeed, a jury could reasonably find that Adams's misbehavior was the more serious of the two, because, unlike Radwan's fleeting gesture to the camera, Adams's actions were not only embarrassing to the university, but also jeopardized the team's chance of victory and could have physically endangered spectators. *See id.* at 702–03 (AD Manuel stating that the penalty that Adams incurred took place "at a significant point in the game" when "the score was relatively tight").

UConn provides several explanations as to why Radwan and Adams are not similarly situated. However, in this case, a jury needs to decide whether these distinctions are material and resolve any conflicting inferences that could be reasonably drawn from the differing facts. For instance, AD Manuel stated that

---

[19] The Student-Athlete Handbook prohibits unsportsmanlike behavior including, but not limited to, "[u]sing obscene or inappropriate language or gestures to officials, opponents, team members or spectators" or "[t]hrowing of objects at individuals, spectators or across a field or arena." Joint App'x at 73.

Adams was not punished by UConn for kicking the ball into the stands because "[t]hings that happen in a game that are dealt with by officials that are unsportsmanlike are usually handled there." *Id.* at 703. In other words, AD Manuel suggested that the discrepancy between how the two incidents were handled was justified because Adams's conduct was "dealt with within the confines of the game" and Radwan's was not. *Id.* at 703–04. Although a jury may credit AD Manuel's assessment, a jury is not required to conclude that misbehavior that occurs after a game is *de facto* more serious than behavior that occurs during it. Adopting this rationale, if Radwan had extended her middle finger during the game, and not after it, her conduct would not have resulted in the loss of her scholarship. Indeed, AD Manuel subsequently acknowledged that determining the level of seriousness for unsportsmanlike conduct during a game, as compared to after a game, "depends on what it is." *Id.* at 704.

AD Manuel further testified that Radwan's gesture was more serious than Adams kicking a ball into the stands because AD Manuel had never seen a winning player make a gesture like Radwan's, and "it [brought] a negative image of herself and the team and the university." *Id.* However, a jury could reasonably debate any assertion that the novelty of the alleged misconduct should necessarily

78

control the level of punishment, and also disagree over whether Radwan's brief, post-game gesture to a camera is substantially more embarrassing to an institution than a player kicking a ball into a crowd of people during a game.[20] Simply put, a jury needs to: (1) determine whether the novelty of Radwan's conduct (in AD Manuel's view) and its timing in relation to the game are material factors in assessing whether Radwan and Adams are similarly situated; and (2) weigh whether the relative level of embarrassment to UConn from their respective misconduct renders their situations different.

Moreover, Adams is not the only male student-athlete to whom Radwan points as receiving more favorable treatment for what she alleges is similar to or more serious misconduct than her own. For instance, shortly after UConn initiated disciplinary proceedings against Radwan, four male UConn basketball players—two of whom had full athletic scholarships—missed curfew during a tournament in Puerto Rico and were sent home to Connecticut early. The basketball coach and

---

[20] One of the amicus briefs filed in support of Radwan notes that Adams's misconduct occurred during a football game that, like Radwan's game, was nationally televised. *See* Legal Momentum Br. at 22 (citing a press release by BYU—UConn's opponent— reporting that ESPN and ESPN2 would televise the game during which Adams's misconduct occurred). However, because this asserted fact is outside the record, we do not consider it here.

AD Manuel (who was personally aware of the incident) instituted no disciplinary proceedings and took no action to terminate the players' scholarships.

In another instance, a male soccer player without an athletic scholarship was arrested for theft and received the most significant penalty of the examples identified in the record involving male student-athletes at UConn—namely, a warning and required participation in a "Living Your Values" workshop. Of the particular incidents contained in the record involving male student-athletes at UConn, no penalty for misconduct comes close to the severity of the one imposed upon Radwan. In fact, it is undisputed that, during AD Manuel's tenure at UConn from March 2012 to March 2016, no male student-athlete was ever permanently removed from his team, or had his scholarship terminated, for a first instance of unsportsmanlike conduct.

Viewing the facts in the light most favorable to Radwan, a reasonable jury could conclude that one or more of these male student-athletes at UConn was sufficiently similar in all material respects to Radwan to raise an inference that, but for her gender, she would not have received the more severe punishment of termination of her scholarship.[21]

_____

[21] Radwan also cites other incidents at UConn involving male student-athletes after AD Manuel was replaced as Athletic Director in March 2016. For example, in September

80

Although UConn argues that this whole group of other incidents involving male student-athletes shares common material distinctions from Radwan's circumstances that would prevent a rational jury from finding that any of them are similarly situated to her, we find those arguments unavailing. First, UConn contends that these other situations involving UConn's male student-athletes cannot be sufficiently similar as a matter of law because the respective discipline was not meted out by the same decisionmaker. The district court agreed with this legal contention, stating that under Title VII, "where employees are disciplined by different supervisors, they are not similarly situated," and then concluding that, because Radwan did not share a coach with any of her proffered comparators, and

---

2016, a member of the UConn football team on a full athletic scholarship became involved in a physical altercation at an off-campus party. The UConn Office of Community Standards, after an administrative hearing, determined that the student had violated various provisions of the Student Code and imposed a sanction of University probation, as well as required completion of an educational project. In addition, in October 2016, another member of the UConn football team on a full athletic scholarship was arrested for allegedly being in possession of marijuana, alcohol while a minor, and a facsimile BB gun. After determining that he had violated several provisions of the Student Code, the UConn Office of Community Standards likewise imposed a sanction of University probation and required participation in an educational wellness program. The scholarship of neither male student-athlete was adversely affected by the findings of having violated the Student Code, nor did the men's football head coach recommend that the students' scholarships be cancelled. We need not, however, evaluate these additional incidents because we conclude that the evidence regarding the other comparators, discussed above, is sufficient to raise issues of fact that preclude summary judgment on this issue.

81

because none of the coaches of the male student-athletes ever recommended to an administrator that their students' scholarships be terminated, those disciplinary decisions never reached the same decisionmaker behind Radwan's termination— namely, AD Manuel. *Radwan*, 465 F. Supp. 3d at 98–99. Accordingly, the district court concluded that Radwan could not demonstrate that the male students were comparators for the purposes of inferring discriminatory intent. *Id.* at 99. We disagree.

This "same decisionmaker" requirement has never existed in this Circuit. To the contrary, under Title VII, we have emphasized that any contention "that another employee cannot be similarly situated to a plaintiff unless the other employee *had the same supervisor*, worked under the same standards, and engaged in the same conduct" is a "misreading" of our precedent. *McGuinness v. Lincoln Hall*, 263 F.3d 49, 53 (2d Cir. 2001) (emphasis added). Although a plaintiff "must be similarly situated in all *material* respects" to her proposed comparators, we have made clear that "[a] plaintiff is not obligated to show disparate treatment of an *identically* situated" individual. *Id.* at 53–54 (internal quotation marks omitted); *cf. Berube v. Great Atl. & Pac. Tea Co.*, 348 F. App'x 684, 686 (2d Cir. 2009) (summary order) ("[T]he fact that [the plaintiff] had a different supervisor from the

employees he cites as comparators does not appear sufficient in itself to preclude [the plaintiff] from showing that he was subject to the same workplace standards and disciplinary procedures."). Thus, under Title VII, although any differences in terms of the identity and/or role of a decisionmaker are among the many factors that should be considered in determining whether a plaintiff's situation is sufficiently similar to a comparator for purposes of demonstrating disparate treatment, the lack of identical decisionmakers is not necessarily dispositive.

Other circuit courts have reached the same conclusion. *See, e.g.*, *Louzon v. Ford Motor Co.*, 718 F.3d 556, 563–64 (6th Cir. 2013) ("[W]e have never read the 'same supervisor' criteri[on] as an inflexible requirement. Rather, a court should make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee." (internal quotation marks and citations omitted)); *see also Cowgill v. First Data Techs., Inc.*, 41 F.4th 370, 382 (4th Cir. 2022) ("[P]laintiffs do not need to share the same supervisor in every case, and that comparison point is not a bar to relief in a case like this one, where the comparators are otherwise similar in all relevant respects." (internal quotation marks omitted)); *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1117–18 (D.C. Cir. 2016) (citing *Louzon* favorably and holding "there

83

remains a genuine issue of material dispute, based on the facts presented, and viewing the evidence in the light most favorable to [the plaintiff nurse], that other nurses were subject to the same decision makers to a sufficient extent to allow a meaningful comparison as to how these nurses were ultimately treated by the Hospital").

The same analysis applies under Title IX. Any rigid "same decisionmaker" rule is unsupported by the text and purpose of Title IX and, as multiple amici point out, functionally would "render Title IX nugatory in virtually all disciplinary cases." ACLU Br. at 10; *see also* Legal Momentum Br. at 23–24 ("[A] same-supervisor requirement would strip Title IX protections from the vast majority of student-athletes."). Because most collegiate athletic teams are single-sex, and because most women's and men's athletic teams are led by different coaches, it is rare that a female and male student-athlete would ever be disciplined by the same individual at the coach's level. Thus, imposing such a requirement would unreasonably and artificially deprive a vast number of student-athletes of the ability to point to a similarly situated comparator.[22] *Cf. Seay v. Tenn. Valley Auth.*,

---

[22] As one of these amicus briefs notes, out of UConn's eighteen sports teams, only four of them have shared coaches for male and female student-athletes and accordingly, a same-supervisor requirement would mean that "student athletes on at least fourteen teams . . . could never point to a legally sufficient comparator, no matter how egregious the

339 F.3d 454, 479–80 (6th Cir. 2003) (emphasizing that a "same supervisor" requirement would be "particularly problematic" where a violation "does not occur frequently enough to invite such a direct comparison within a compartmentalized organization"); *accord Louzon*, 718 F.3d at 564 (noting that such a requirement could limit the "pool of potential comparators . . . to no more than a few individuals" and "would render any plaintiff's burden virtually impossible, even at the prima facie stage"). Moreover, establishing such a requirement could allow institutions to effectively immunize themselves from Title IX liability by delegating disciplinary authority to the individual coaches of single-sex teams. Any such requirement also overlooks the reality that an institution could have a biased supervisory official or a culture of discrimination that permeates and influences the decisions among different decisionmakers. *See, e.g., Columbia Univ.*, 831 F.3d at 58–59 (emphasizing, in its analysis of a Title IX claim, that "[a]ccording to precedent under Title VII, a defendant institution is not shielded from liability for discrimination practiced by an employee endowed by the institution with supervisory authority or institutional influence in recommending and thus

---

discrimination." Legal Momentum Br. at 23. Moreover, because "eight single-sex teams at UConn do not have a corresponding team of the opposite sex," under a rule requiring comparators to participate in the same sport, "nearly 50% of student-athletes at UConn would be unable to point to a legally sufficient comparator." *Id.* at 24.

influencing the adverse action by a non-biased decision-maker"); *Mandell*, 316 F.3d at 378–79 (allowing consideration of evidence of an employer's anti-Semitic culture even though some of the proffered examples of the culture involved decisionmakers unrelated to the plaintiff's situation).

Further, although the "same decisionmaker" factor may often be an important one, we note that its importance can vary greatly depending on the context. *See Cohen*, 101 F.3d at 177 (noting that "athletics . . . requires a different analysis [from employment] in order to determine the existence *vel non* of discrimination"). For example, to the extent that it may be difficult to draw an inference of discrimination from decisions by different decisionmakers in the employment context, where individuals frequently have varied job responsibilities and standards of performance, a shared decisionmaker may be a less relevant factor in the world of student athletics, which is dominated by single-sex teams with similar performance metrics and that are bound by the same standards of conduct.

Similarly, the "same decisionmaker" factor may be less important "where those who disciplined the plaintiff were well-aware of the discipline meted out to [her] comparator." *Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 611 (6th Cir.

86

2019) (internal quotation marks omitted). For example, here, Radwan points to evidence that AD Manuel (who was undisputedly the ultimate decisionmaker as to Radwan's discipline) was (1) at the game when Adams kicked the ball into the stands and spoke to him after the game, and (2) aware of the UConn male athletes breaking curfew in Puerto Rico and discussed the handling of that situation with the coach.

Therefore, we decline to impose a "same decisionmaker" requirement under Title IX and conclude that any variation in who made the disciplinary decisions at UConn, when comparing Radwan to male student-athletes, does not preclude a rational jury from finding that the male student-athletes are "similarly situated" to Radwan for Title IX purposes under the facts of this case.[23]

---

[23] In reaching its conclusion to the contrary, the district court relied heavily on the Sixth Circuit's unpublished decision in *Heike*, 519 F. App'x 911, which held that "[t]o be similarly situated, a player must have dealt with the same [coach], have been subject to the same standards, and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or their employer's treatment of them for it." *Id.* at 920 (internal quotation marks and emphasis omitted). As a threshold matter, we note that *Heike* did not involve Title IX, but rather concerned a claim of race discrimination under the Equal Protection Clause as it related to the renewal of athletic scholarships. *Id.* at 916–17. Furthermore, the language on this issue cited in *Heike* is from *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344 (6th Cir. 1998), which specifically stated that "[c]ourts should not assume . . . that [these] factors . . . are relevant factors in cases arising under different circumstances, but should make an independent determination as to the relevancy of" those factors in the specific factual context. *Id.* at 352. In any event, to the extent the summary order in *Heike* could be viewed as embracing

UConn's additional factual arguments, as to why the whole group of male student-athlete comparators are not similarly situated to Radwan and cannot support an inference of gender discrimination, fare no better. UConn asserts that no reasonable juror could find that any of the UConn male student-athletes who engaged in misconduct are similarly situated to Radwan because: "(1) none of them made an obscene gesture on national television while representing UConn; (2) none of them were reprimanded by the AAC for their behavior; and (3) none of their coaches recommended to the assigned sports administrator and the athletic director that their grant-in-aid should be cancelled because of their behavior." Appellees' Br. at 54.

As for the first argument, although a comparator must be similarly situated to Radwan in material respects, as discussed above, they need not be *identically* situated. *See McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 283 n.11 (1976) ("[P]recise equivalence in culpability between employees is not the ultimate question."). Instead, the "similarly situated" requirement can be met if the plaintiff and the comparator "were (1) 'subject to the same performance evaluation and discipline standards' and (2) 'engaged in comparable conduct.'" *Ruiz*, 609

a categorical "same decisionmaker rule," we decline to follow that rule for the reasons stated herein.

F.3d at 493–94 (quoting *Graham*, 230 F.3d at 40). There are certainly all types of misconduct committed by student-athletes that, although not specifically involving an offensive gesture to a national television audience, could be comparable in their level of seriousness to Radwan's conduct. Juries are well equipped to compare and weigh these differing forms of misconduct under the common disciplinary standards that applied to all student-athletes at UConn. Therefore, we reject any contention that, to survive summary judgment, Radwan was required to demonstrate that a proposed comparator committed the exact same misconduct as she did or to present an identical factual analog to her situation.

As for UConn's second proposed distinction, regarding the fact that the AAC did not reprimand the male student-athletes but did reprimand Radwan, such a factual distinction would not also necessarily preclude a rational jury from concluding that they were similarly situated. There are many reasons why misconduct that is similar in nature to Radwan's (or even more serious) may not become the focus of an AAC investigation and/or sanction, such as certain types of misconduct by a player that took place off the field (as to which the AAC may not even be aware). In addition, Radwan counters that the fact that the AAC

deemed a reprimand and two-game suspension to be sufficient punishment, but UConn nevertheless proceeded to impose an even greater punishment, only bolsters the inference that Radwan received a disproportionate sanction because of her gender. Because competing reasonable inferences may be drawn from this sequence of events and the AAC's involvement in light of the entire record, we cannot usurp the role of the jury and conclude that the AAC reprimand distinguishes Radwan from other male student-athletes at UConn as a matter of law and thereby prevents a rational jury from drawing an inference of gender discrimination from the differing treatment in the wake of the AAC's reprimand. Instead, such factual issues must be left for a jury to determine at trial.

Finally, UConn's related factual distinction, regarding the absence of any recommendation of additional discipline for the male student-athletes by their respective coaches (in contrast to Coach Tsantiris's recommendation as to Radwan), is merely a reframing of UConn's broader attempt to have this Court adopt a "same decisionmaker" requirement. As discussed above, we decline to do so and do not find this factual distinction to be dispositive in this case for summary judgment purposes.

In short, based upon the evidence in this case, the district court erred in not allowing the jury to decide whether the circumstances surrounding the misconduct of male student-athletes at UConn were sufficiently similar to Radwan, such that the jury could infer that the more favorable treatment of the male student-athletes was evidence of gender discrimination under Title IX. This evidence not only was sufficient to establish a *prima facie* case of selective enforcement but also, along with the other evidence discussed below, provides support for Radwan's overall effort to rebut UConn's non-discriminatory reasons for her discipline. *See Bentley v. AutoZoners, LLC*, 935 F.3d 76, 89 (2d Cir. 2019) (explaining that, with respect to the ultimate burden under the *McDonnell Douglas* framework, "[a] plaintiff may carry this burden by reference to the same evidence used to establish a *prima facie* case, provided that the evidence admits plausible inferences of pretext").

> b. *UConn's Non-Discriminatory Reasons for Radwan's Sanction*

Although UConn has articulated legitimate, non-discriminatory reasons for the disciplinary sanctions imposed on Radwan, Radwan argues that the record shows internal inconsistencies in the justifications for terminating her scholarship proffered by Coach Tsantiris and AD Manuel, from which a rational jury can infer

pretext and discriminatory intent. *See generally St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993) (holding, under Title VII, that "rejection of the defendant's proffered reasons [for the adverse actions] will *permit* the trier of fact to infer the ultimate fact of intentional discrimination" but does not "*compel*[]" such an inference).

First, regarding the grounds for the termination of her scholarship, Radwan points to testimony from Coach Tsantiris that he had no other disciplinary problems with Radwan and that "[t]here was no other reason" why he recommended terminating her scholarship other than the gesture. Joint App'x at 719. In contrast, AD Manuel repeatedly testified that "it was not only [the gesture], but there were issues and things that [Coach Tsantiris] was dealing with . . . her on the team that—before the incident that sort of compounded everything to him wanting to remove her from the team." *Id.* at 685–86; *see also id.* at 695 (stating that "it was a combination of things that built up" to Coach Tsantiris's recommendation); *id.* at 706 ("[I]t was more than just her [gesture] that was presented to me in terms of . . . why it was handled more than a removal of her scholarship.").

Second, regarding the perceived severity of the incident, Coach Tsantiris testified that the incident was "serious misconduct," *id.* at 720, describing it as a "devastating" occurrence that had "never happened before," *id.* at 715. However, he also allegedly told Radwan that it was a "silly mistake," *id.* at 17, and likewise informed the coach at Hofstra (prior to Radwan's transfer to that school) that Radwan was a "good kid" who had made "one mistake," *id.* at 526. Similarly, AD Manuel described the incident as serious misconduct, but also noted, prior to Coach Tsantiris's recommendation, that the AAC was likely to only issue a "[l]etter of [r]eprimand" in response to the incident, as "[a]nything else would be excessive." *Id.* at 707. Similarly, he later informed the UConn President that the "[c]ase [was] closed with the reprimand." *Id.* at 710. Moreover, UConn wrote in an email to the AAC, in which it accepted the letter of reprimand for Radwan, that "[s]he has learned a valuable the lesson [sic] the hard way but *we hope that now we can all put this behind us* and move on to winning a national championship in women's soccer." *Id.* at 260 (emphasis added).

In addition, Radwan contends that UConn's failure to follow proper internal disciplinary procedures for the mid-year termination of her scholarship, and its accompanying efforts to frustrate her ability to bring an appeal, support a rational

93

inference that the justifications proffered were a pretext for gender discrimination. *See generally Stern v. Trs. of Columbia Univ.*, 131 F.3d 305, 313 (2d Cir. 1997) (explaining how, under certain circumstances, procedural irregularities may support an inference of discriminatory intent or pretext under Title VII). For example, Radwan points out that her case was not referred to the regular student disciplinary authority, and she was not given any opportunity to contest the violation (or the penalty imposed) before a neutral decisionmaker. She further cites to the conflicting deadlines she was given for requesting a hearing outlined in the notification letter she received from UConn, as well as Coach Tsantiris's alleged instruction to Radwan "not to involve anyone [else]" or to appeal his decision. Joint App'x at 264.

UConn counters that none of the purported inconsistencies or alleged procedural issues (which UConn disputes) undermine its determination that Radwan engaged in serious misconduct, nor do they demonstrate that any of the reasons offered for her scholarship termination—including that her conduct required UConn to issue a formal apology and that she was the only UConn student to ever receive a reprimand from the AAC—was pretextual. However, as with the comparator evidence, these fact-specific issues cannot be resolved on

94

summary judgment based on the record in this case. *See, e.g., Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 170 (2d Cir. 2001) ("[A] jury issue on the question of pretext may be created when an employer offers inconsistent and varying explanations for its decision to terminate a plaintiff."); *see also Tolbert v. Smith*, 790 F.3d 427, 438 n.9 (2d Cir. 2015) ("While the defendants assert that [the plaintiff's] evaluation was reassigned because [the assigned reviewer] was having difficulty completing his evaluations on time, it is for a jury to decide whether that explanation is credible and rebuts any inference of discrimination that could be drawn from the alleged procedural irregularity.").

In sum, we conclude that, when the evidence in the record is taken as a whole and is construed most favorably to Radwan, a rational jury could find that, but for her gender, Radwan's alleged misconduct would not have caused UConn to terminate her scholarship. Accordingly, we vacate the grant of summary judgment on Radwan's Title IX claim and remand for proceedings consistent with the above.

## III.   CONCLUSION

We **AFFIRM** the district court's grant of summary judgment as to Radwan's procedural due process and First Amendment claims and **VACATE** the district

court's judgment to the extent it granted summary judgment to UConn on the Title IX claim. The case is **REMANDED** to the district court for further proceedings consistent with this opinion.